Kathleen E. Brody (026331)
kathy@mscclaw.com
Molly Brizgys (#29216)
molly@mscclaw.com
MITCHELL | STEIN | CAREY | CHAPMAN, PC
One Renaissance Square
2 North Central Avenue, Suite 1450
Phoenix, AZ 85004
Telephone: (602) 358-0293
Facsimile: (602) 358-0291

Peter Rukin (SBN 178336)*
prukin@rukinhyland.com
Jessica Riggin (SBN 281712)*
jriggin@rukinhyland.com
Valerie Brender (SBN 298224)*
vbrender@rukinhyland.com
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612
Tel: (415) 421-1800
Fax: (415) 421-1700

(*Additional Counsel for Plaintiffs Listed on the Following Page*)

(*Pro hac vice application forthcoming)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| F.R., on his own behalf and on behalf of his minor child, A.A.,<br><br>Plaintiffs,<br>v.<br><br>United States of America,<br><br>Defendant. | Case No.<br><br>**COMPLAINT** |

Complaint for Damages

Paul Hoffman (SBN 71244)*
hoffpaul@aol.com
Melanie Partow (SBN 254843)*
melaniepartow@gmail.com
University of California, Irvine School of Law
Civil Rights Litigation Clinic
401 E. Peltason Drive, Ste. 1000
Irvine, CA 92697
Tel: (310) 717-7373
Fax: (310) 399-7040

(*Pro hac vice application forthcoming)

1. Plaintiffs F.A.S.R ("F.R.") and his young son, A.M.S.A ("A.A."), bring this complaint against the United States of America pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b) and under state law, stating as follows:

**I. INTRODUCTION**

2. This action seeks damages for the mistreatment of Plaintiffs A.A., a six-year-old minor, and his father, F.R., while they were in the custody of the United States government. Plaintiffs came to the United States seeking refuge from economic hardship in Honduras. Instead, they were detained and forcibly separated for approximately 100 days. The trauma Plaintiffs experienced at the hands of Defendant was scarring and has had long-lasting injuries.

3. These injuries were a direct and intended result of Defendant's Family Separation Policy, which affected thousands of migrant families like Plaintiffs. The decision to separate young children from their parents at the border was made at the highest levels of government, with the purpose of deterring families from seeking refuge in the United States. Indeed, the U.S. government knew that these separations would cause extreme emotional distress. Multiple government officials and experts warned the government of the harm that family separations would cause and this harm has been well documented by government agencies and the medical community.

4. The government inflicted additional trauma by depriving and delaying communication between separated parents and children and failing to implement any system for tracking children so that families could be reunited. As a result, F.R. was denied regular contact with A.A. throughout their separation and was sent back to Honduras without A.A.

5. The government's family separation policy was cruel, inhumane, and unconstitutional. In June of 2018, a federal judge enjoined the government from separating migrant families who had been detained together and ordered the government to begin reuniting families who were separated. In granting this preliminary injunction, the district court found that the government's policy likely violated families' due process

rights to family integrity under the U.S. Constitution.

6. Plaintiffs bring this action under the FTCA for compensation for the extraordinary harms they suffered at the hands of the federal government.

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

8. Venue is proper under 28 U.S.C. § 1402(b) and 28 U.S.C. § 1391(e)(1) because certain of the acts or omissions complained of and giving rise to these claims occurred within this District.

9. On February 25, 2020, Plaintiffs submitted administrative claims to the U.S. Department of Homeland Security, U.S. Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, and U.S. Department of Health and Human Services. On May 29, 2020, the U.S. Department of Justice sent Plaintiffs an acknowledgement that the Department of Health and Human Services (HHS) received Plaintiffs claims on February 27, 2020, and the U.S. Department of Justice received them on March 11, 2020. The U.S Department of Justice designated the U.S. Department of Health and Human Services as the lead agency. None of the agencies have made a final disposition of Plaintiffs' administrative claim, and, as six months have passed since submission of the claims, they are deemed finally denied. 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all available administrative remedies.

## III. PARTIES

10. Plaintiff F.R., the father of A.A., was thirty-two years old at the time of the forced separation described in this Complaint.

11. Plaintiff A.A., the minor son of F.R., was six years old at the time of the forced separation described in this Complaint.

12. Defendant United States of America is sued under the Federal Tort Claims Act for the tortious acts of its employees, including employees of the Department of Health and Human Services ("HHS") and the Department of Homeland Security

("DHS"), including its constituent units, Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and the United States Citizenship and Immigration Services ("USCIS"), as well as for the tortious actions of contractors that DHS and HHS directly supervised.

13. All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the course and scope of their employment with federal agencies, including, but not limited to, DHS, ICE, CBP, and HHS.

14. Defendant's employees were responsible for separating F.R. and A.A. Defendant's employees were also responsible for managing and detaining F.R. and A.A. at CBP, ICE, and/or other government facilities, including those located in Arizona and Texas.

15. Defendant's employees were responsible for supervising and managing the detention of children that the government classifies as unaccompanied, including at facilities in Texas where A.A. was detained.

16. At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

## IV. STATEMENT OF FACTS

**A.  The United States Developed a Family Separation Policy with Knowledge and Intent to Cause Harm.**

**1.  Factual Background.**

17. Between the summer of 2017 and June 26, 2018, the United States separated thousands of children from their parents who crossed the U.S.-Mexico border. The core purpose of this executive policy ("Family Separation Policy") was to cause enormous suffering and harm to these migrants, thereby deterring them from seeking refuge in the United States. The Policy violated the Constitution and statutory and common law.

1  18. Indeed, the harm caused by family separations is well documented. For example, in a May 8, 2018 statement opposing family separation, the American Academy of Pediatrics (AAP) summarized, "[H]ighly stressful experiences, like family separation, can ... disrupt[ ]a child's brain architecture and affect[ ] his or her short-and long-term health. This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong consequences for children."[1]

  19. The U.S. Department of Health and Human Services, Office of Inspector General Report ("HHS OIG Report") has acknowledged that historically family separations were "rare" and were generally undertaken because "of circumstances such as the parent's medical emergency or a determination that the parent was a threat to the child's safety."[2] Thus, Family Separation Policy was a sharp departure from the governments' practices regarding detained families.

### 2. The U.S. government begins separating families with the knowledge that separations will likely cause substantial harm.

  20. When it implemented the Family Separation Policy, the government knew that it would cause harm. For example, in 2016, the DHS Advisory Committee on Family Residential Centers concluded that "the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children," and that "[f]amily separation in these circumstances raises serious concerns and violates the best interests of the child—which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members."[3]

---

[1] *Jacinto-Castanon de Nolasco v. U.S. Immigration and Customs Enforcement* 319 F.Supp.3d 491, 503 (D.D.C. 2018) (quoting American Academy of Pediatrics, *AAP Statement Opposing Separation of Children and Parents at the Border*, May 8, 2018, *available at* https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx).

[2] U.S. Department of Health & Human Services, Office of Inspector General, *Separated Children Placed in Office of Refugee Resettlement Care*, HHS OIG Issue Brief, OEI-BL-18-00511 at 3 (January 2019), available at https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf ("HHS OIG Report")

[3] U.S. Immigration & Customs Enforcement, Department of Homeland Security, Report

21. Commander Jonathan White, former Deputy Director of the Office for Refugee Resettlement ("ORR") for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, in early 2017, he warned those devising the Policy that the Family Separation Policy "would be inconsistent with [the government's] legal requirement to act in the best interest of the child and would expose children to unnecessary risk of harm."[4] He also cautioned that the policy would "exceed the capacity" of ORR's program "to provide a safe and appropriate environment to every child" and would "particularly exceed [their] capacity" to provide care to children under the age of 12, who are supposed to be housed in specially licensed facilities.[5] White acknowledged in his testimony that "separation of minors from their parents involves a risk of severe psychological trauma."[6]

22. Furthermore, when the U.S. government announced that it was considering a family separation policy, the AAP publicly opposed the policy, stating:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers. Proposals to separate children from their families as a tool of law enforcement to deter immigration are harsh and counterproductive.[7]

---

of the DSH Advisory Committee on Family Residential Centers 2, 10 (2016), available at https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[4] Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), https://docs.house.gov/meetings/IF/IF02/20190207/108846/HHRG-116-IF02-Transcript-20190207-U1.pdf

[5] *Id.*

[6] *Id.*; *see also* Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html;

[7] Fernando Stein & Karen Remley, Am. Acad. of Pediatrics, AAP Statement Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017), https://perma.cc/AZ5Q-TN38.

23. In May of 2017, the AAP issued the following Policy Statement on Detention of Immigrant Children:

> Separation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for safety of the child at the hand of parent. Efforts should always be made to ensure that children separated from other relatives are able to maintain contact with them during detention.[8]

24. Despite these and other warnings, in 2017, the U.S. government began a yearlong initiative that sought to increase criminal immigration enforcement on the Southwest border that included forcibly separating families.

25. On April 11, 2017, the Attorney General, Jeff Sessions, issued a memorandum instructing federal prosecutors to prioritize prosecution of certain immigration offenses, including misdemeanors that had not previously been an enforcement priority.[9] This memorandum required the Southwest border U.S. Attorneys' Offices (USAOs) to develop district-specific guidelines for charging first-time offenders with misdemeanor illegal entry under 8 U.S.C. § 1325, which addresses attempts by an individual who is not a U.S. citizen "to enter the country at an improper time or place."[10] In response, the District of Arizona's (DAZ) guidelines addressed such prosecutions by providing that the USAO would prosecute all first-time entrants referred for prosecution for illegal entry in addition to those cases presenting aggravating circumstances and repeat offenders.[11]

26. The first known, widespread implementation of the Family Separation Policy stemming from Sessions' April 2017 memorandum was in the El Paso sector,

---

[8] Julie M. Linton, Marsha Griffin, Alan J. Shapiro, and Council on Community Pediatrics, PEDIATRICS, May 2017, 139 (5) e20170483; DOI: https://doi.org/10.1542/peds.2017-0483

[9] Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Department s of Homeland Security and Health and Human Services, Department of Justice, Office of the Inspector General, at 9-10 (January 2021), available at https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf ("DOJ OIG Report").

[10] *Id.* at 9-10

[11] *Id.* at 10.

which includes the USAO of the Western District of Texas and the District of New Mexico.[12] From July through November 2017, the El Paso sector of CBP (an agency within DHS) implemented new policies that resulted in approximately 280 individuals in families being separated.[13] Under these policies, the government prioritized the prosecution of misdemeanor charges of improper entry under 8 U.S.C. § 1325, including the prosecution of parents who crossed the border into the United States with young children. When a child and parent were apprehended together by immigration authorities, DHS separated the family, with the parent being placed in the custody of the U.S. Marshals Service within the DOJ to await prosecution for immigration offenses.[14] The child was then erroneously treated as an unaccompanied minor and transferred to the ORR.[15]

27. By the time F.R. and A.A. came to the United States in March of 2018, the Family Separation Policy was underway at other border crossings, including in Arizona.

28. On April 6, 2018, not long after F.R. and A.A. arrived in the United States, Attorney General Sessions formally instituted a "zero-tolerance policy" for offenses under 8 U.S.C. § 1325(a).[16] During a public speech in May 2018, Attorney General Sessions described this policy, announcing that DHS was now referring all adults making allegedly unlawful Southwest border crossings to the DOJ for prosecution and that the DOJ would accept those cases.[17] This zero-tolerance policy announcement was the culmination of a yearlong period during which the DOJ, beginning with Sessions' April 2017 memorandum, described above, sought to increase criminal immigration enforcement on the Southwest border.[18] While the April 2017 memorandum had made illegal entry cases a priority, it had not told prosecutors to stop declining illegal entry

---

[12] *Id.* at 14-15.
[13] *Id.*
[14] HHS OIG Report at 4.
[15] *Id.*
[16] HHS OIG Report at 3-4.
[17] *Id.*
[18] DOJ OIG Report at 8.

cases. However, the zero-tolerance policy instituted in 2018 signaled that prosecutors were not to decline illegal entry cases.[19]

29. Prior to the creation and expansion of the Family Separation Policy, individuals apprehended between ports of entry who were not considered an enforcement priority (e.g., a public safety threat, repeat unlawful border crosser, convicted felon, or suspected child trafficker) were not consistently prosecuted for illegal entry under Section 1325, in part to avoid having DOJ resources committed to prosecuting sizable numbers of misdemeanors.[20] And when DHS apprehended adults with children crossing the border, DHS typically detained and administratively removed the adults and children together under civil immigration proceedings or would provide the family unit adult with a Notice to Appear before an Immigration Judge and then release the family to remain in the United States until the adult's immigration hearing date.[21] This long-standing DHS practice of deferring to civil immigration proceedings and enforcement, rather than having the DOJ criminally prosecute adults entering the United States with children as a family unit, was related to concerns about separating children from their family during the pendency of the parent's prosecution.[22]

### 3. The U.S. Government intended for the harm caused by the Family Separation Policy to have a deterrent effect on migrants.

30. As confirmed by government officials and reports, the purpose of the above-described Family Separation Policy was to deter migrants from seeking entry into the United States. For example, a December 2017 joint DOJ and DHS memorandum noted that the "prosecution of family units," resulting in separation, "would be reported by media and . . . have substantial deterrent effect" on future migration.[23] On May 11,

---

[19] *Id.* at 22.
[20] *Id.* at 4.
[21] *Id.* at 6.
[22] *Id.*
[23] *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html; *see also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation*

- 8 -
Complaint for Damages

2018, John Kelly, President Trump's then-Chief of Staff, stated on NPR that "a big name of the game is deterrence . . . . It could be a tough deterrent — would be a tough deterrent."[24] When the interviewer asked about whether it was "cruel and heartless" to take a parent away from their children, he replied, "[t]he children will be taken care of — put into foster care or whatever."[25] And in June 19, 2018, Steve Wagner, Assistant Secretary of HHS said, "[w]e expect that the new policy will result in a deterrence effect . . . ."[26]

31. Even after a federal judge enjoined the family separation policy because it likely violated families' due process rights to family integrity, President Trump continued to underscore the policy's deterrent effect. When speaking with reporters at the White House on October 13, 2018, he said: "If they feel there will be separation, they don't come."[27] And on April 28, 2019—after the family separation policy had purportedly ended—President Trump told Fox News host Maria Bartiromo, "Now you don't get separated, and while that sounds nice and all, what happens is . . . literally you have ten times as many families coming up because they're not going to be separated from their children[.] . . . It's a disaster."[28]

---

*of Children*, NBC NEWS, Jan. 17, 2019, https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targetingmigrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).
[24] Transcript: White House Chief of Staff John Kelly's Interview with NPR, NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr
[25] *Id.*
[26] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASHINGTON POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/
[27] David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, REUTERS, Oct. 13, 2018, https://www.reuters.com/article/us-usa-immigrationtrump/trump-says-family-separations-deter-illegal-immigration-idUSKCN1MO00C.
[28] Kimberly Kindy, Nick Miroff & Maria Sacchetti, Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings, WASH.

32. As described above, the administration knew – and specifically intended – for the family separation policy to cause severe trauma and harm to ultimately deter families from migrating to the United States.

**B. F.R. and A.A. Came to the United States, Were Detained in the "Icebox," and Were Forcibly Separated.**

33. F.R. fled his home country of Honduras with his minor son, A.A., due to economic hardship.

34. F.R. and A.A. traveled through Sonora, Mexico and entered the United States in approximately early March of 2018 at the U.S.-Arizona border.

35. F.R. and A.A. were detained by CBP officers, taken to an office, and later transferred to a holding center that detainees frequently called "the icebox" ("*la hielera*") because of its hold temperatures.[29]

36. CBP confiscated F.R.'s identification card, A.A.'s birth certificate, and the extra clothes that Plaintiffs brought with them. Plaintiffs were forced to sit on cold floors without any beds or blankets and with all the lights on. They were offered only soup and water to eat and drink. Officers frequently entered the *hielera* throughout the night and woke other detainees up to collect their information. F.R. could not sleep under these conditions, and A.A. struggled to sleep.

37. After approximately 10-12 hours, in the late afternoon or early evening, an immigration official arrived and spoke to F.R. The immigration officer said that she was there to take A.A. away. The immigration officer forcibly separated A.A. from F.R. F.R. begged the immigration officer not to take his son, but the immigration officer did not listen. A.A. became angry and scared during the removal and pleaded with his father not

---

POST, Apr. 28, 2019, https://washingtonpost.com/politics/trumpsays-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-bordercrossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5story.html.

[29] Similar types of conditions have been enjoyed by the United States District Court for the District of Arizona. *See Doe v. Kelly,* 878 F.3d 710, 715–718 (9th Cir. 2017).

to leave him in the United States alone. Both A.A. and F.R. cried during the forcible removal.

38. No U.S. government official told F.R. where A.A. was going to be taken. The officer who separated A.A. from F.R. only stated that she was taking him to an unknown location. F.R. had informed the U.S. government upon entry that he had an aunt that lived in Washington; however, the U.S. government made no effort to place A.A. with this family member.

39. Other than the U.S. government's family separation policy, there was no basis for removing A.A. from F.R. For example, in conducting the separation, the U.S. government did not allege or make any showing that F.R. was unfit to care for or posed a danger to A.A. Nor did F.R. have a criminal or medical history warranting separation.

### C. A.A. Was Transferred to and Held in a Children's Shelter in Texas for Approximately 100 Days.

40. It took F.R. approximately 15-16 days to learn where his son was placed. Other detainees told him that he could send a letter to a government agency to learn about the whereabouts of his son. None of the available immigration officers with whom he was detained would volunteer this information. When F.R. finally received a response to his letter, he learned that his son had been placed in a shelter for minors in Texas. F.R. was not informed of the exact location of this shelter, which should have been in the possession of the U.S. government.

41. While separated, F.R. and A.A. were only permitted to have limited calls. F.R. recalls government officials limiting these calls to once a week for 15 minutes. A.A. cried throughout each call. F.R. also cried, as it pained him to know that his son was alone, scared, and suffering. During these calls, A.A. begged F.R. not to leave A.A. in the United States.

Complaint for Damages

42. Later when he was back in Honduras, A.A. told his parents that while he was in detention, a woman at the shelter locked A.A. in a room by himself, apart from the other children, on multiple occasions in order to punish him. This made A.A. feel very depressed, as he didn't understand why the woman at the shelter did this to him.

**D. The Government's Separation of F.R. and A.A. Has Caused Both of Them Severe and Lasting Emotional Distress and Other Psychological Injury.**

43. After immigration officials forcibly took A.A., F.R. was extremely distraught. He cried, wanted to kick himself, felt destroyed, and thought about hurting or killing himself. He wanted to hit himself until he could not feel anything. Immediately after the separation, F.R. tried to hit his head against a wall, but other detainees physically restrained him. He could not imagine going home without his child. F.R. did not want to live, felt sick, and felt ongoing distress about being deported without his son.

44. During the two weeks that F.R. did not know where his son was and could not get in contact with him, F.R. worried constantly about A.A.'s physical safety, mental health, and treatment. After more than a month in detention, the U.S. government deported F.R. to Honduras. F.R. thought that he was going to be reunited with his son at the airport. He did not realize that he was going to be deported without his son. It was extremely distressing when he realized that the U.S. government would not reunite him with his son upon deportation. He was heartbroken and haunted by A.A. pleading over the phone, "Papá no me dejes" ("Dad, don't leave me.").

45. Once F.R. was back in Honduras, officials at the children's shelter told F.R.'s wife that F.R. could not speak to A.A. on the phone because F.R. had left A.A. in the United States, and as a result, F.R. had lost his rights as a father. Over the next two months, F.R. was only permitted to speak with his son on the phone once, approximately eight days before F.R. was reunited with his son.

46. During the time that A.A. was separated from his family, no one ever told F.R. when they would be reunited or how long A.A. would be in the custody of the U.S.

Complaint for Damages

government, which caused F.R. great distress.

47. For F.R., being apart from A.A. was like missing a limb. F.R. felt powerless. He had trouble sleeping throughout the separation because he was worried about A.A's safety and wellbeing. F.R. tried his best to "keep going" for his son.

48. After being separated from his family for approximately 100 days, A.A. was finally returned to Honduras and reunited with his family.

49. Upon being reunited, F.R. and A.A.'s family immediately noticed that A.A. was not the same. A.A. has had trouble sleeping, concentrating, and has exhibited challenging behavior. For example, A.A. has struggled with wetting the bed since his return. He did not have any issues with bed wetting before he was separated from his family. A.A. has also become more erratic and aggressive. For example, A.A. has been physically aggressive with his two siblings by pulling their hair and hitting them. F.R. does not trust A.A. to be alone with his siblings because F.R. is worried that A.A. could hurt them. F.R. and his family now take extra precautions due to A.A.'s unsafe behavior. A.A. has also become less respectful towards authority figures, especially members of A.A.'s family. When F.R. and other family members ask about what happened to A.A. in the U.S., A.A. gets very angry and agitated. He does not like to talk about the separation or what the shelter was like. These changes in behavior are ongoing.

50. A.A.'s teachers have also noticed negative changes in A.A.'s behavior. A.A. now gets into fights with other children, and he sometimes gets angry when other children try to play with him. These were not behaviors that A.A. exhibited at school before the separation occurred.

51. Finally, since returning home, A.A. has been shy and standoffish in unfamiliar situations. A.A. fears strangers and does not like to be approached by people he does not know.

52. Because of the U.S. government's forcible separation, A.A. suffered and continues to suffer severe emotional distress and other harm.

53. F.R. also continues to suffer as a result of the separation from his son.

- 13 -
Complaint for Damages

Every day he lives with the trauma of having his son stripped away from his arms. He has tried to help A.A. since his son's return, but his son's ongoing struggles make him feel sad and depressed about what he and his son endured.

### E. The Government's Separation of F.R. and A.A. Was Unconstitutional and Unlawful.

54. The Constitution protects everyone within the territory of the United States, regardless of citizenship; therefore, non-citizens physically on U.S. soil have constitutional rights, including the right to due process of law. Furthermore, the liberty interest identified in the Fifth Amendment provides a right to family integrity and familial association. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (stating "the relationship between parent and child is constitutionally protected."); *see also Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established.").

55. In June of 2018, the Hon. Dana M. Sabraw enjoined the U.S. government's family separation policy and practice and found that a plaintiff class, comprising of class members like F.R. and A.A., was likely to succeed on their claim that the U.S. government violated migrant families' due process rights to family integrity through implementation of the policy. *Ms. L. v. U.S Immigration and Customs Enforcement ("ICE")*, 310 F.Supp.3d 1133, 1149 (S.D. Cal. 2018), *modified* 330 F.R.D. 284 (S.D. Cal. 2019), and *enforcement granted in part, denied in part sub nom. Ms. L. v. U.S. Immigration and Customs Enforcement,* 415 F.Supp.3d 980 (S.D. Cal. 2020). Judge Sabraw ordered that the U.S. government cease detaining migrant parents apart from their minor children absent a determination that the parent is unfit or presents a danger to the child.

56. In reaching this holding, Judge Sabraw observed that the U.S. government separated families without an effective system or procedure for tracking children after they were separated, without enabling communication between the parents and children, and without reuniting the parents and children, even after the parents returned to

immigration custody following or completing criminal sentences. Judge Sabraw found these practices "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 1145. F.R. and A.A. were subjected to these practices, as described above.

57. A January 2021 DOJ, Office of the Inspector General Report concluded that the DOJ, Office of Attorney General "demonstrated a deficient understanding of the legal requirements related to the care and custody of separated children" and "did not effectively coordinate" with other government agencies such as HHS when implementing the policy.[30] The Report also concluded that the OAG's "single-minded focus on increasing immigration prosecutions came at the expense of careful and appropriate consideration of the impact of family unit prosecutions and child separations."[31]

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Intentional Infliction of Emotional Distress**

58. The allegations of each of the preceding paragraphs are re-alleged and incorporated herein by reference.

59. By engaging in the acts described in this Complaint, including but not limited to forcibly separating F.R. and A.A., withholding information about A.A. from F.R., depriving F.R. and A.A. of contact, the treatment of F.R. and A.A. while in custody, and repatriating F.R. without A.A., the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

60. As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress, as described herein.

61. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

---

[30] DOJ OIG Report at i.
[31] *Id.*

## SECOND CAUSE OF ACTION
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Negligence**

62. The allegations of each of the preceding paragraphs are re-alleged and incorporated herein by reference.

63. The federal officers referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs. They also had mandatory, non-discretionary duties, including but not limited to those imposed by the U.S. constitution.

64. By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs by forcibly separating Plaintiffs, withholding information about A.A. from F.R., depriving F.R. and A.A. of contact, the treatment of F.R. and A.A. while in custody, and repatriating F.R. without A.A., among other actions described herein. As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

65. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

## THIRD CAUSE OF ACTION
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Loss of Child's Consortium**

66. The allegations of each of the preceding paragraphs are re-alleged and incorporated herein by reference.

67. A.A. has suffered severe, permanent, and disabling injuries.

68. A.A. must now cope with the long-term mental health effects and trauma caused by Defendant, federal officials, and federal employees referenced above.

69. Those injuries substantially interfere with the capacity of A.A. to interact with F.R. in a normally gratifying way.

70. A.A. continues to struggle to communicate with F.R., especially about the separation and the abuse that he suffered. Furthermore, since being reunited, A.A. has

- 16 -
Complaint for Damages

become erratic and aggressive, become disrespectful towards F.R., has engaged in bed wetting, and has been physical with his two siblings, such that F.R. must closely watch A.A.

71. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for loss of consortium.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award Plaintiffs:

    A. Compensatory damages in an amount to be proven at trial;

    B. All reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

    C. Such other relief as the Court deems just and appropriate.

Dated: February 25, 2021    MITCHELL | STEIN | CAREY | CHAPMAN, PC

By:   s/ Kathleen E. Brody

Attorneys for Plaintiffs
Kathleen E. Brody
Molly Brizgys

RUKIN HYLAND & RIGGIN LLP
Peter Rukin*
Jessica Riggin*
Valerie Brender*

UNIVERSITY OF CALIFORNIA, IRVINE
SCHOOL OF LAW
Civil Rights Litigation Clinic
Paul Hoffman*
Melanie Partow*

(*Pro hac vice application forthcoming)

- 17 -
Complaint for Damages