GARY M. RESTAINO
United States Attorney
District of Arizona
KATHERINE R. BRANCH
Assistant U.S. Attorney
Arizona State Bar No. 025128
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona  85004-4449
Telephone:  (602) 514-7500
Civil Fax:  (602) 514-7760
Main Fax: (602) 514-7693
Email: Katherine.Branch@usdoj.gov
*Attorneys for Defendant*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| F.R., on his own behalf and on behalf of his minor child A.A.,<br><br>                Plaintiffs,<br><br>v.<br><br>United States of America,<br><br>                Defendant. | No. CV-21-00339-PHX-DLR<br><br>**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** |

Defendant United States of America respectfully moves to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. As discussed below, Congress has not waived sovereign immunity for the types of claims asserted in this action. As such, the claims are jurisdictionally barred. This motion is based on the following memorandum of points and authorities and all matters of record.

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    OVERVIEW.

In March 2018, Plaintiff F.R.—who had been removed from the United States in 2014—unlawfully reentered with his minor child, Plaintiff A.A. F.R. was detained, separated from A.A., and prosecuted for his unlawfully entry. F.R. was then removed to Honduras, and two months later, A.A. was repatriated and reunited with his family. F.R. and A.A. bring this

1    action under the Federal Tort Claims Act ("FTCA"), seeking monetary damages for alleged

2    injuries caused by (1) Defendant's implementation of a policy to refer for prosecution all

3    individuals suspected of illegally entering the United States at the United States–Mexico

4    border, including parents traveling with children (referred to herein as the "Zero-Tolerance

5    Policy"), and (2) the conditions of confinement and treatment of Plaintiffs after they were

6    separated. Plaintiffs assert claims for intentional infliction of emotional distress, negligence

7    and loss of consortium. *See* ECF No. 1 ("Complaint") ¶¶ 58-71.

8          The United States has denounced the prior practice of separating children from their

9    families at the United States–Mexico border and "condemn[ed] the human tragedy" that

10   occurred because of the Zero-Tolerance Policy. *Establishment of Interagency Task Force on*

11   *the Reunification of Families*, Exec. Order 14,011, § 1, 86 Fed. Reg. 8273, 8273 (Feb. 5,

12   2021). The Biden Administration has committed the federal government to "protect family

13   unity and ensure that children entering the United States are not separated from their families,

14   except in the most extreme circumstances where a separation is clearly necessary for the

15   safety and well-being of the child or is required by law." *Id.*

16         That said, the Court should not reach the merits of Plaintiffs' FTCA claims. Plaintiffs'

17   alleged injuries are not compensable under the FTCA because Congress has not waived the

18   federal government's sovereign immunity for claims for money damages in these

19   circumstances. Although the United States recognizes that district courts adjudicating FTCA

20   claims arising out of the Zero-Tolerance Policy—including in this District—have reached

21   differing conclusions on the threshold jurisdictional arguments presented in this motion to

22   dismiss, the United States respectfully submits that on the better reading of the law, Congress

23   has not waived sovereign immunity and Plaintiffs may not recover under the FTCA.

24   **II.    FACTUAL AND LEGAL BACKGROUND.**

25         **A.    Statutory framework for noncitizens[1] entering the United States.**

26         Pursuant to Title 8 of the U.S. Code, when a noncitizen enters the United States

27

28   ───────────────

[1] This brief uses the term "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

between official ports of entry, he or she may be prosecuted for criminal immigration violations, including entering the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers." 8 U.S.C § 1325(a). Section 1325(a) is a misdemeanor that is punishable by a fine and 'imprison[ment] not more than 6 months" for a first infraction. *Id*. A subsequent violation may result in imprisonment of not more than two years. *Id.* Reentering the United States without authorization after having been previously removed is a felony. 8 U.S.C. § 1326. An individual who reenters the United States without authorization after having been removed "shall be fined under title 18, or imprisoned not more than 2 years, or both." *Id.* § 1326(a).

Noncitizens who arrive in the United States, including those who arrive between ports of entry, are considered "applicant[s] for admission" and are "inspected by immigration officers" to determine their admissibility to the United States. 8 U.S.C. §§ 1225(a)(1), (a)(3), (b). Individuals arriving in or present in the United States who, following inspection, are deemed inadmissible, are subject to removal from the United States and, as appropriate, detention pending such removal. *See id*. §§ 1225(b); 1226; 1357. These provisions apply to both adults and children. Detention of noncitizens with final order of removal, including reinstated orders of removal, is governed by 8 U.S.C. § 1231(a).[2] It authorizes detention in two circumstances. "During the removal period," the Attorney General "shall" detain the individual. *Id.* § 1231(a)(2). "[B]eyond the removal period," the Attorney General "may" continue to detain certain individuals specified in the statute or release them under an order of supervision. *Id.* § 1231(a)(3). The removal period specified in § 1231(a)(1)(A) lasts 90 days, and begins on the latest of the following: (1) the date the order of removal becomes

---

[2] If an individual who has been removed from the United States under a removal order later reenters the country unlawfully, the prior removal order may be reinstated. *See Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 487 (9th Cir. 2007). If the removal order is reinstated, it is "reinstated from its original date and is not subject to being reopened or reviewed," 8 U.S.C. § 1231(a)(5), and the individual is not eligible to apply for relief except for withholding of removal based on a reasonable fear of persecution or torture. *See* 8 C.F.R. § 208.31.  Plaintiffs did not seek withholding of removal. *See* Ex. A-2, Form I-213 (Record of Deportable/Inadmissible Alien) for F.R.

administratively final; (2) if the removal order is judicially reviewed, and if a court orders a stay of the removal of the individual, the date of the court's final order; or (3) if the noncitizen is detained or confined (except under an immigration process), the date the individual is released from detention or confinement. *Id.* § 1231(A)(1)(B). The federal government possesses statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." *Id.* § 1231(g)(1). In some cases, the Department of Homeland Security ("DHS") may exercise its discretion to release a noncitizen from custody. *See, e.g.*, 8 U.S.C. §§ 1182(d)(5), 1226(a)(2).

**B.      Statutory framework for immigration custody relating to unaccompanied minors.**

Federal immigration law authorizes the United States to provide for the custody and care of minor children who are present in the United States without lawful immigration status. Specifically, the Department of Health and Human Services' Office of Refugee Resettlement ("ORR") is charged with "the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status." 6 U.S.C. §§ 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1). The term "unaccompanied alien child" or "UAC" is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom . . . there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

Under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency . . . shall transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). ORR seeks to place UACs "in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). However, ORR "shall not release such children upon their own recognizance." 6 U.S.C. § 279(b)(2). Rather, once in ORR custody, there are detailed statutory and regulatory provisions that must be followed before the child is released to an approved sponsor. *See* 8 U.S.C. § 1232(c)(3). Congress requires that "an unaccompanied

1    alien child may not be placed with a person . . . unless the Secretary of Health and Human

2    Services makes a determination that the proposed custodian is capable of providing for the

3    child's physical and mental well-being" and that "[s]uch determination shall, at a minimum,

4    include verification of the custodian's identity and relationship to the child, if any, as well

5    as an independent finding that the individual has not engaged in any activity that would

6    indicate a potential risk to the child." *Id.* § 1232(c)(3)(A). In some instances, a home study

7    is required. *Id*. § 1232(c)(3)(B).

8            **C.      Flores Agreement requirements.**

9            In 1996, the federal government entered into a settlement agreement referred to as the

10   "Flores Agreement." *See, e.g.*, *Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015)

11   (ECF No. 101). The Flores Agreement "sets out nationwide policy for the detention, release,

12   and treatment of minors in the custody of the [immigration authorities]." *Flores v. Lynch*,

13   828 F.3d 898, 901 (9th Cir. 2016) (citing Flores Agreement ¶ 9). Under a binding

14   interpretation of the Ninth Circuit, the Flores Agreement "unambiguously" applies both to

15   unaccompanied minors and to minors who are encountered together with their parents or

16   legal guardians. *Id.* at 901. Under the Flores Agreement, the government must expeditiously

17   transfer any minor who cannot be released from custody to a non-secure, licensed facility.

18   *Id*. at 902-03 (quoting Flores Agreement ¶ 12). The government must also "make and record

19   the prompt and continuous efforts on its part toward . . . release of the minor." *Flores v.*

20   *Rosen*, 984 F.3d 720, 738 (9th Cir. 2020) (quoting Flores Agreement ¶ 14).

21           Notably, the Flores Agreement applies only to minors. *Flores*, 828 F.3d at 901. It

22   "does not address . . . the housing of family units and the scope of parental rights for adults

23   apprehended with their children[,]" and it "does not contemplate releasing a child to a parent

24   who remains in custody, because that would not be a 'release.'" *Flores*, 828 F.3d at 906; *see*

25   *also United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *9 (W.D.

26   Tex. Jan. 5, 2018) ("[*Flores*] does not provide that parents are entitled to care for their

27   children if they were simultaneously arrested by immigration authorities[.]"). Nor does the

28   Flores Agreement provide any rights to adult detainees, including any rights of release.

1    *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 WL 315759, at *14-15; *Bunikyte*

2    *v. Chertoff*, No. 07-164, 2007 WL 1074070, at *16 (W.D. Tex. Apr. 9, 2007). Although the

3    Flores Agreement gives preference to release of minors to a parent, this preference "does not

4    mean that the government must also make a parent available; it simply means that, if

5    available, a parent is the first choice." *Flores*, 828 F.3d at 908.

6          **D.    Executive Branch directives regarding immigration enforcement.**

7          During the time period relevant to this action, the Executive Branch issued several

8    directives regarding enforcement of federal immigration laws. Executive Order 13767 § 1,

9    82 Fed. Reg. 8793 (Jan. 30, 2017) ("EO 13767"). First, in January 2017, the former President

10   issued EO 13767 stating that "[i]t is the policy of the executive branch to . . . detain

11   individuals apprehended on suspicion of violating Federal or State law, including Federal

12   immigration law, pending further proceedings regarding those violations[.]" *Id*. § 2(b).

13   Executive Order 13767 directed DHS to "ensure the detention of aliens apprehended for

14   violations of immigration law pending the outcome of their removal proceedings or their

15   removal from the country to the extent permitted by law," *id*. § 6, and to exercise its parole

16   authority "only on a case-by-case basis in accordance with the plain language of the statute

17   . . . and in all circumstances only when an individual demonstrates urgent humanitarian

18   reasons or a significant public benefit derived from such parole." *Id*. § 11(d).

19         Second, on April 11, 2017, DOJ issued guidance to all federal prosecutors regarding

20   a renewed commitment to criminal immigration enforcement and directed that federal law

21   enforcement prioritize the prosecution of several immigration offenses, including illegal

22   entry under 8 U.S.C. § 1325 and illegal reentry of individuals who had been removed

23   previously. *See* U.S. DOJ Memorandum on Renewed Commitment to Criminal Immigration

24   Enforcement (April 11, 2017), available at https://www.justice.gov/opa/press-

25   release/file/956841/download.

26         Third, on April 6, 2018, the former Attorney General issued a "Memorandum for

27   Federal Prosecutors along the Southwest Border." U.S. DOJ News Release: Attorney

28   General Announces Zero-Tolerance Policy for Criminal Illegal Entry (April 6, 2018), DOJ

18-417, 2018 WL 1666622 (the "Zero-Tolerance Memorandum"). The memorandum directed federal prosecutors along the United States–Mexico border "to the extent practicable, and in consultation with DHS, to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)." *Id*. Consistent with EO 13767 and the April 2018 Zero-Tolerance Memorandum, DHS began to refer for prosecution increased numbers of adults – including those traveling with children – who unlawfully entered the United States along the Southwest border in violation of Section 1325. *See generally* EO 13767. Minor children of those adults were transferred to ORR custody as required by the TVPRA.

### E.   Prosecution of Plaintiff F.R.

According to the Complaint, Plaintiffs are a father and son from Honduras who illegally crossed the United States–Mexico Border in early March 2018. Compl. ¶¶ 2, 10-11, 33-34. Shortly after crossing, they were apprehended by U.S. Customs and Border Protection ("CBP") Border Patrol agents and transported to a holding facility. *Id.* ¶ 35. The father, F.R., who had been removed from the United States in 2014, had his previous removal order reinstated, and was referred for prosecution for violating 8 U.S.C. §§ 1325 (illegal entry) and 1326 (illegal re-entry). Ex. 1, Declaration of Shawn J. Jordan, ¶ 8; Ex. 1-A, Form I-213 (Record of Deportable/Inadmissible Alien). On March 2, 2018, F.R. was charged with violating 8 U.S.C. § 1325(a)(1) and was  transferred to the criminal custody of the United States Marshals Service ("USMS"). Ex. 1 ¶ 9. F.R. pled guilty to violating 8 U.S.C. § 1325(a)(1) and was sentenced to five (5) days in prison. *See* Ex. 2, Judgment in a Criminal Case.[3] Following his conviction, F.R. was transferred to ICE custody and held in secure adult detention facilities pursuant to his reinstated order of removal. Ex. 1 ¶¶ 12-13; Ex. 3, Declaration of Christopher D. McGregor, ¶¶ 5, 12. F.R. was removed to Honduras on April 4, 2018. Ex. 3 ¶ 6.

---

[3] In order to comply with the Court's order granting Plaintiff F.R.'s Motion to Proceed Under Pseudonym (Doc. 10), Defendant has redacted the filing information from these documents, which could be used to ascertain Plaintiff F.R.'s name. Defendant can provide an unredacted version of the criminal case filings upon request.

Upon F.R.'s transfer to USMS custody, he was no longer available to provide care and physical custody for his son. A.A. was designated an unaccompanied minor and transferred to the custody of ORR, as required by the TVPRA. Compl. ¶ 40. A.A. was transferred to Texas. *Id.* A.A. was issued a Notice of Appear before an immigration judge. Ex. 1 ¶ 14, Ex. 1-D. A.A. was granted voluntary departure by an immigration judge and left the United States for Honduras on July 9, 2018, whereupon he was reunited with his family. Compl. ¶ 48.

### F. Plaintiffs' complaint.

Plaintiffs bring this action against the United States under the FTCA, 28 U.S.C. §§ 1346(b)(1), 2671-2680, seeking damages for intentional infliction of emotional distress (Count 1), negligence (Count 2), and loss of child's consortium (Count 3). Compl. ¶¶ 58-71. Plaintiffs allege that these harms stemmed from (1) the prosecution of F.R. under the Zero-Tolerance Policy, which resulted in the separation of F.R. and A.A., and (2) the conditions of confinement and treatment of Plaintiffs after they were separated.

As to claims based on "the treatment of F.R. and A.A. while in custody," Compl. ¶ 59, Plaintiffs allege that CBP officials "forced them to sit on cold floors without any beds or blankets and all the lights on [and] offered only soup and water to eat or drink," *id.* ¶ 36. They also allege that when A.A. was in ORR custody, he was "locked [] in a room by himself, apart from the other children, on multiple occasions in order to punish him." *Id.* ¶ 42. Plaintiffs further allege that government officials limited calls between F.R. and A.A. to once a week for 15 minutes, *id.* ¶ 41; and providing only limited information to F.R. about where A.A. had been placed, *id.* ¶ 40.

### G. Subsequent policy changes.

After assuming office, President Biden took action to repudiate the policies that led to Plaintiffs' separation and to reunify the families that were affected by those policies. On February 2, 2021, the President issued an Executive Order that condemned the "human tragedy" of the prior Administration's Zero-Tolerance Policy, and that committed the United States government to "protect family unity and ensure that children entering the United

States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law." Family Reunification Task Force EO § 1. That Order created a Task Force to identify and reunify families separated under the Zero-Tolerance Policy, and to make recommendations for the potential provision of immigration benefits and mental-health services to those separated families. *Id.* § 4; *see also* Interim Progress Report, Interagency Task Force on the Reunification of Families 3, Nov. 29, 2021, available at https://www.dhs.gov/sites/default/files/publications/21_1129_s1_interim-progress-report-family-reunification-task-force.pdf.

## III.   LEGAL STANDARD.

A defendant may move to dismiss a complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1039-40 (9th Cir. 2003). Courts must consider the threshold issue of jurisdiction before addressing the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Plaintiffs bear the burden of establishing jurisdiction because, by filing a complaint in federal court, they seek to invoke it. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The Court may dismiss an action under Rule 12(b)(1) if the complaint does not allege facts sufficient to establish subject matter jurisdiction on its face or, even if the complaint asserts grounds for jurisdiction on its face, the evidence does not support a finding of jurisdiction. *Thornhill Publishing Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). A facial attack "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. A factual challenge allows the court to look beyond the complaint without "presum[ing] the truthfulness of the plaintiff's allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). The Court also can hear evidence outside the pleadings and resolve factual disputes, if necessary, without treating the motion as one for summary

judgment. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1997). "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence," and the plaintiff's allegations carry no presumption of truthfulness. *Robinson*, 586 F.3d at 685. Whether a facial or factual attack, because "[f]ederal courts . . . have only that power that is authorized by Article III of the Constitution and the statutes enacted by Congress," *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) (citation omitted), the Court presumes the action lies outside its limited jurisdiction, and the burden is on the party asserting jurisdiction to establish that it exists. *Kokkonen,* 511 U.S. at 377.

A district court cannot hear a suit against the United States unless the government has waived sovereign immunity. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). "Sovereign immunity is jurisdictional in nature," meaning that a party's failure to establish a waiver of sovereign immunity is properly resolved on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *See Robinson*, 586 F.3d at 685; *Sierra Club v. Whitman*, 268 F.3d 898, 905-906 (9th Cir. 2001).

## IV.   PLAINTIFFS' CLAIMS ARE JURISDICTIONALLY BARRED.

For the reasons set forth below, Plaintiffs' claims should be dismissed for lack of jurisdiction. The government does not defend the merits of the policy choices at issue in this case, which have now been repudiated. Indeed, President Biden has condemned the "human tragedy" that resulted from the Zero-Tolerance Policy and committed not to repeat that tragedy. Family Reunification Task Force EO § 1. But this case does not concern the wisdom of those now-revoked policies. Instead, it is a personal injury suit for damages under the FTCA. Plaintiffs cannot prevail on their FTCA claims because this Court lacks subject-matter jurisdiction under established legal principles.

### A.   The claims are barred by the discretionary function exception.

#### 1.   Legal standard for discretionary function exception.

The United States, as a sovereign entity, is immune from suit except insofar as it has specifically and expressly consented to be sued. *Lehman v. Nakshian*, 453 U.S. 156, 160-61

1   (1981) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). "[T]he terms of [the

2   government's] consent to be sued in any court define that court's jurisdiction to entertain the

3   suit." *Lehman*, 453 U.S. at 160 (internal quotes and citations omitted). Absent a specific,

4   express waiver, sovereign immunity bars a suit against the government for lack of subject

5   matter jurisdiction. *See FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994).

6           The FTCA is "a limited waiver of sovereign immunity." *Gonzalez v. United States*,

7   814 F.3d 1022, 1026 (9th Cir. 2016). The statute allows individuals to sue the United States

8   when a federal employee's conduct, within the scope of his or her employment, causes

9   "injury, loss of property, or personal injury or death." 28 U.S.C. § 1346(b)(1). However, the

10  FTCA's waiver of sovereign immunity is subject to exceptions. *See* 28 U.S.C. § 2680.

11          When an exception applies, the United States retains its sovereign immunity, the court

12  lacks jurisdiction, and the claim must be dismissed. *See Nurse v. United States*, 226 F.3d

13  996, 1000 (9th Cir. 2000). One such exception – the "discretionary function exception"

14  ("DFE") – bars "[a]ny claim" that is "based upon the exercise or performance or the failure

15  to exercise or perform a discretionary function or duty on the part of a federal agency or an

16  employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.

17  § 2680(a); *see also Gaubert v. United States*, 499 U.S. 315, 325 (1991); *Berkovitz v. United*

18  *States*, 486 U.S. 531, 536 (1988).

19          The Supreme Court has set forth a two-part test to determine if the DFE applies.

20  *United States v. Gaubert*, 499 U.S. at 328-32. Courts must first ask whether the challenged

21  conduct was in fact "discretionary in nature" – that is, whether the conduct involved "'an

22  element of judgment or choice.'" *Id.* at 322 (quoting *Berkovitz*, 486 U.S. at 536); *see also*

23  *Chadd v. United States*, 794 F.3d 1104, 1109 (9th Cir. 2015). The first prong is met unless

24  "'a federal statute, regulation, or policy specifically prescribes a course of action for an

25  employee to follow.'" *Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996) (quoting

26  *Berkovitz*, 486 U.S. at 536); *see also Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001)

27  ("[A] general regulation or policy . . . does not remove discretion unless it specifically

28  prescribes a course of conduct."); *Reed ex rel. Allen v. U.S. Dep't of Interior*, 231 F.3d 501,

504 (9th Cir. 2000) (since "[n]o federal statute, regulation, or policy require[d] a particular course of action," the agency's actions "could be no other way than by the exercise of discretion"). Even if a regulation contains a mandate to do something, if that mandate involves judgment or choice, the discretion element is satisfied. *See GATX/Airlog Co. v. United States,* 286 F.3d 1168, 1174-75 (9th Cir. 2002). Further, where the policies that inform the conduct at issue allow the exercise of discretion, the defendant's acts or failures to act are presumed to be discretionary. *Lam v. United States*, 979 F.3d 665, 674 (9th Cir. 2020). Finally, the applicable policies and authorities must be considered in context – "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Id*. at 677 (citing *Gonzalez*, 814 F.3d at 1030).

Second, if the conduct involves choice or discretion, courts must next determine whether the judgment of the government employee was "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23. Recognizing that tort actions challenging the government's discretionary policy judgments could "seriously handicap efficient government operations," Congress designed the DFE to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy" through a tort action. *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984). The focus of this inquiry is whether the "nature of the actions taken," pursuant to an exercise of discretion, "are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325; *see also Nurse*, 226 F.3d at 1001 (explaining that the decision "'need not actually be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis.'") (quoting *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998)).

The government need not "prove that it considered these factors and made a conscious decision on the basis of them." *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1028 (9th Cir. 1989). Indeed, under the second prong, the government actors' subjective motive is immaterial: "the focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation" but rather "on the nature of the actions taken

and on whether they are *susceptible* to policy analysis." *Gonzalez*, 814 F.3d at 1027-28 (quoting *Gaubert*, 499 U.S. at 325) (emphasis added). Where the relevant policies provide for discretion, it must be presumed that the government's actions are grounded in policy when exercising that discretion. *Lam*, 979 F.3d at 681 (citing *Gaubert*, 499 U.S. at 324; *Chadd*, 794 F.3d at 1104). And the statutory text confirms that the exception applies "whether or not the discretion involved [was] abused" by United States officials. 28 U.S.C. § 2680(a); *see also Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (DFE applies where there are allegations of "malicious and bad faith conduct" because "subjective intent is irrelevant to our analysis").

If both prongs of the *Gaubert/Berkowitz* test are met, the DFE applies, the United States retains its sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed. *See Nurse*, 226 F.3d at 1000. This result applies even where the government may have been negligent in the performance of such discretionary acts, as "negligence is irrelevant to the discretionary function inquiry." *Routh v. United States*, 941 F.2d 853, 855 (9th Cir. 1991). As the legislative history of the FTCA explains, the statute's limited waiver of sovereign immunity was "not intended to authorize suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion." H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10.

2.     **The decisions to prosecute F.R. under the Zero-Tolerance Policy and to detain him in secure adult detention facilities pending removal are discretionary in nature.**

Plaintiffs' claims based on the decisions to prosecute F.R. and to detain him pending removal, which resulted in the separation of F.R. and A.A., are barred by the DFE because these decisions involved an element of judgment or choice, and are susceptible to policy analysis. Plaintiffs do not contest that CBP lawfully apprehended them after they crossed the border illegally. Nor do Plaintiffs contest that F.R. was properly subject to prosecution under 8 U.S.C. § 1325 (illegal entry) and § 1326 (illegal reentry) or that the government had discretion to prosecute him. And Plaintiffs do not dispute that the government had discretion to transfer F.R. to USMS custody in connection with his prosecution and imprisonment.

1    These decisions, which resulted in F.R. and A.A.'s separation pursuant to the TVPRA,
2    are quintessentially discretionary. *See also infra* Part IV.B (explaining that the United States
3    is not liable in tort for carrying out the requirements of the TVPRA). As the Supreme Court
4    has recognized, "[t]he Attorney General and United States Attorneys retain 'broad
5    discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456,
6    464 (1996). Indeed, "[t]he Supreme Court has long recognized that 'the Executive Branch
7    has exclusive authority and absolute discretion to decide whether to prosecute a case.'" *In re
8    Sealed Case*, 829 F.2d 50, 63 (D.C. Cir. 1987) (quoting *United States v. Nixon*, 418 U.S.
9    683, 693 (1974)); *Smith v. United States*, 375 F.2d 243, 247 (5th Cir. 1967) ("decisions
10   concerning enforcement" are matter of "discretion"). Thus, as the Ninth Circuit has
11   recognized, "[t]he decision whether or not to prosecute a given individual is a discretionary
12   function for which the United States is immune from liability" under the FTCA. *General
13   Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1998).

14   As other courts have recognized, the particular prosecution policy that was in place
15   when Plaintiff was prosecuted—the Zero-Tolerance Policy, which was subsequently
16   revoked—"amounts to exercise of the prosecutorial discretion that Congress and the
17   Constitution confer on the Attorney General." *Mejia-Mejia v. ICE*, No 18-1445 (PLF), 2019
18   WL 4707150, at *5 (D.D.C. Sept. 26, 2019); *see also Peña Arita*, 470 F. Supp. 3d at 686-87.
19   The discretionary function exception bars the Court from "second-guessing" or inquiring
20   into government actors' intent in exercising that prosecutorial discretion. *Berkovitz*, 486 U.S.
21   at 536; *see also Lam*, 979 F.3d at 673 (citing *Varig*, 467 U.S. at 814). In determining the
22   applicability of the DFE, the Court looks only at whether the conduct or decision at issue is
23   "'susceptible' to policy analysis" from an objective perspective – subjective intent is not part
24   of the inquiry. *Gonzalez*, 814 F.3d at 1032. Here, however, the government's decisions were
25   not merely "susceptible to" policy analysis, but the government spelled out the policies it
26   sought to further through its enforcement efforts in a series of Executive Branch directives,
27   as the Complaint itself notes. *See*, *e.g.*, Compl. ¶¶ 25, 28-29.

28   Following completion of his criminal sentence, F.R. was transferred to ICE custody

- 14 -

1   pending his removal from the United States pursuant to his reinstated order of removal. Ex.

2   1 ¶¶ 12-13, Ex. 3 ¶¶ 5-6. During that time, F.R. was detained pursuant to 8 U.S.C.

3   § 1231(a)(2) in secure adult detention facilities. F.R. was removed approximately one month

4   after his illegal reentry. Compl. ¶ 44.

5           The government's decisions concerning where to detain F.R. pending removal were

6   also discretionary and susceptible to policy analysis. Concerns about "subjecting the

7   prosecutor's motives and decision making to outside inquiry" are magnified in the

8   immigration context. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490

9   (1999). There, the federal government possesses the express statutory authority to "arrange

10  for appropriate places of detention for aliens detained pending removal or a decision on

11  removal." 8 U.S.C. § 1231(g)(1).[4] "Congress has placed the responsibility of determining

12  where aliens are detained within the discretion of the [Secretary]." *Comm. of Cent. Am.*

13  *Refugees v. I.N.S.*, 795 F.2d 1434, 1440 (9th Cir. 1986) (emphasis added); *see also*

14  *Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995) ("The INS necessarily

15  has the authority to determine the location of detention of an alien in deportation proceedings

16  . . . and therefore, to transfer aliens from one detention center to another."); *Sasso v.*

17  *Milhollan*, 735 F. Supp. 1045, 1046 (S.D. Fla. 1990) (holding that the Attorney General has

18  discretion over the location of detention); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir.

19  1999) (holding that the "Attorney General's discretionary power to transfer aliens from one

20  locale to another, as she deems appropriate, arises from" statute).

21          As the Ninth Circuit has explained, "[b]ecause the decision to detain an alien pending

22  resolution of immigration proceedings is explicitly committed to the discretion of the

23  Attorney General and implicates issues of foreign policy, it falls within this [FTCA]

24  exception." *Mirmehdi v. United States*, 662 F.3d 1073, 1081-82 (9th Cir. 2011); *see also*

25  *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998) (decisions where to place

26  prisoners are policy-based decisions protected by DFE); *Bailor v. Salvation Army*, 51 F.3d

---

27  [4] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney
28  General" now mean the Secretary of Homeland Security. *See Clark v. Suarez Martinez*, 543
    U.S. 371, 374 n.1 (2005).

678, 685 (7th Cir. 1995) (decisions whether to detain or release are policy-based decisions protected by DFE); *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) (placement decisions are susceptible to policy analysis); *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) ("assignment to particular institutions or units . . . must be viewed as falling within the discretionary function exception to the FTCA").

This discretion necessarily entails decisions regarding with whom noncitizens are detained, including decisions regarding whether adults and minors can be detained in the same facility and whether to detain family members together. *See Peña Arita v. United States*, 470 F. Supp. 3d 663, 691-92 (S.D. Tex. 2020) (decisions by DHS to separate family members are protected by the DFE). Although the Flores Agreement contains some requirements concerning the detention of minors, it does not specifically prescribe a course of action and thus does not remove the government's discretion. Moreover, the Flores Agreement does not require release of a parent or mandate that parents be housed with their children. *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 WL 315759, at *14-15; *Bunikyte*, 2007 WL 1074070, at *16; *see supra* at 5-6. In this case, Plaintiffs allege government officials violated "mandatory, non-discretionary duties, including but not limited to those imposed by the U.S. constitution[,]" Compl. ¶ 63, but Plaintiffs do not actually cite any statutes, regulations, policies, or constitutional provisions that prescribe a specific course of action that the government was required to take in connection with the prosecution and detention of F.R. Instead, the challenged decisions were the result of the exercise of discretion. Accordingly, the exercise of the statutory authority regarding whether and where to detain F.R. for removal following his criminal proceedings is protected by the discretionary function exception.

For similar reasons, the decision to determine that A.A. was "unaccompanied" within the meaning of the TVPRA is a decision covered by the DFE. *See* 6 U.S.C. § 279(g)(2). Whether a parent is "available to provide care and physical custody" is a policy question vested in federal officials. *See D.B. v. Poston*, 119 F. Supp. 3d 472, 482-83 (E.D. Va. 2015) ("Federal agencies are afforded discretion under the statutory scheme when

1    classifying juveniles as unaccompanied alien children."), *aff'd in part and vacated in part*,

2    826 F.3d 721 (4th Cir. 2016).  And here, the fact that F.R. was prosecuted and transferred to

3    the custody of the U.S.M.S., and, after serving his sentence, was then sent to secure

4    immigration detention supports the officials' determination that A.A. should have been

5    deemed unaccompanied and thus transferred to the custody of ORR.

6         In the end, Plaintiffs do not allege injury from any government action or decision that

7    was not subject to discretion and susceptible to policy analysis. To the extent that Plaintiffs

8    suggest that the government was required to release them into the interior, did not have the

9    discretion to prosecute F.R. for criminal violations of immigration law, or did not have

10   discretionary authority to determine that A.A. was unaccompanied, the adoption of the Zero-

11   Tolerance Policy and related Executive Branch directives regarding immigration

12   enforcement—which have since been rescinded—are quintessential discretionary policy

13   judgments subject to the DFE.

14        **3.    Plaintiffs' remaining claims concerning their conditions of
                  confinement are barred by the discretionary function exception.**

15

16        Plaintiffs also bring claims based on "the treatment of F.R. and A.A. while in

17   custody." Compl. ¶ 59. Among other things, Plaintiffs allege that CBP officials "forced them

18   to sit on cold floors without any beds or blankets and all the lights on [and] . . . offered only

19   soup and water to eat or drink." *Id.* ¶ 36. Plaintiffs further allege that government officials

20   limited calls between F.R. and A.A. to once a week for 15 minutes, *id.* ¶ 41; and provided

21   only limited information to F.R. about where A.A. had been placed, *id.* ¶ 40.

22        Courts have repeatedly held that claims based on acts or omissions relating to

23   "conditions of confinement" are barred by the DFE because the manner in which the

24   government manages and operates its detention facilities involves discretionary decisions

25   susceptible to policy considerations. *See, e.g.*, *Bultema v. United States*, 359 F.3d 379, 384

26   (6th Cir. 2004) (decision not to provide bed rails susceptible to policy considerations);

27   *Campos v. United States*, 888 F.3d 724, 733 (5th Cir. 2018) (deficiencies in computer

28   database that failed to reveal immigration status protected by discretionary function

     exception); *Cosby v. Marshals Service*, 520 F. App'x 819, 821 (11th Cir. 2013) (detainee

- 17 -

decisions involve "several policy considerations . . . including prison security, the allocation of finite resources, and the logistics of prisoner transportation if transfer to an off-site facility is an option"); *Patel v. United States*, 398 F. App'x 22, 29 (5th Cir. 2010) (DFE shielded decision to transfer prisoner); *Antonelli v. Crow*, No. 08-261, 2012 WL 4215024, at *3 (E.D. Ky. Sept. 19, 2012) (collecting cases in which myriad conditions of confinement claims, including claims based on temperature and crowding, barred by DFE); *Lineberry v. United States*, No. 3:08-cv-0597, 2009 WL 763052, at *6 (N.D. Tex. Mar. 23, 2009) ("Plaintiff's allegation of negligent overcrowding falls within the discretionary function exception"). In particular, courts have held that detained individuals have "no right to unlimited telephone use," *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994), and that a detainee's right to telephone access is "subject to rational limitations in the face of legitimate security interests," *id.* (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)); *see also Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552, 559 (E.D. Va. 2006) ("[T]he BOP's provision of telephone services is a matter committed to its discretion that will not be second-guessed through an FTCA claim.").

### 4.   Plaintiffs' assertion of unconstitutional conduct does not preclude application of the discretionary function exception.

That Plaintiffs claim that certain alleged conduct violated the Constitution does not alter the discretionary function analysis. Congress did not create the FTCA to address constitutional violations, but rather to address violations of state tort law committed by federal employees. *See FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (recognizing that "§ 1346(b) does not provide a cause of action for" a "constitutional tort claim"). As noted, the Supreme Court has explained that when a "federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow," there is no further discretion to exercise. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536) (emphasis added). The Constitution is no different: in some cases, the Constitution may establish such a specific prescription that it removes an official's discretion, but the requirement of specificity applies with the same force whether the prescription is found in the Constitution or a statute.

The Supreme Court has long recognized that conduct may be discretionary even if it is later determined to have violated the Constitution. The common law doctrine of official immunity thus applies to the exercise of "discretionary functions" even when the conduct violated the Constitution, so long as the constitutional right was not defined with sufficient specificity that the official should have known the act was prohibited. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *see also*, *e.g.*, *Wilson v. Layne*, 526 U.S. 603, 614-615 (1999) (applying the "discretionary function[]" formulation and holding that officers were entitled to qualified immunity because, although their conduct violated the Fourth Amendment, the law was not clearly established at the time).

Thus, when the Supreme Court in *Berkovitz* held that a federal mandate must "specifically prescribe[]" conduct in order to overcome the discretionary function exception, it referred to official immunity precedent, underscoring that the two standards operate in tandem. 486 U.S. at 536 (citing *Westfall v. Erwin*, 484 U.S. 292, 296-297 (1988)). Accordingly, the discretionary function exception is not made inapplicable by every allegation of unlawful or unconstitutional conduct, but only by a showing that the government official's discretion was cabined by a specific, clearly established directive, accompanied by plausible assertions that the specific directive was violated. *See, e.g.*, *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019) ("Because . . . the CBP officers did not violate clearly established constitutional rights, the FTCA claims also fail" under the discretionary function exception.).

Indeed, even before it specifically addressed the qualified immunity standards applicable to federal employees, the Supreme Court in *Butz v. Economou*, 438 U.S. 478 (1978), explicitly recognized that the discretionary function exception would apply even if alleged conduct might later be held unconstitutional. The Court in that case held that officials sued for violations of constitutional rights were entitled to qualified, but not absolute

immunity. The Court explained that were it otherwise, the recently recognized *Bivens* remedy would be illusory, and, as relevant here, it noted that "no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused." *Id.* at 505. *Butz* and subsequent decisions thus leave no doubt that conduct that violates the Constitution may constitute the type of abuse of discretion that falls within the scope of the discretionary function exception.

The Ninth Circuit has declined to decide "the level of specificity with which a constitutional proscription must be articulated in order to remove the discretion of a federal actor." *Nurse*, 226 F.3d at 1002 n.2; *see also Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1251 (9th Cir. 2019) ("[I]f the district court instead determines that Defendants did violate a nondiscretionary federal constitutional . . . directive, the FTCA claims may be able to proceed to that degree."). For the reasons discussed, a court should require the same level of specificity that would be required in determining whether a statute left an employee with "no discretion to abuse."

In any event, whatever the precise standard, it is not satisfied here. Plaintiffs have alleged actions of various kinds by various officials. Regardless of whether some or all of these acts reflected an abuse of discretion, Plaintiffs have identified nothing in the decisions of the Supreme Court or the Ninth Circuit that removed any official's discretion with respect to any of the categories of asserted actions by "specifically prescribe[ing] a course of action for an employee to follow." *Gaubert*, 499 U.S. at 322. Indeed, as the Fourth Circuit observed, "we . . . have been unable to find a substantive due process right to family unity in the context of immigration detention pending removal." *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210-11 (4th Cir. 2019). And while some decisions, including decisions in this District, have concluded that constitutional allegations made the exception inapplicable, none has analyzed the relevant standards set out in the Supreme Court's FTCA decisions and in its

1  decisions involving official immunity.[5]  Those principles make clear that the discretionary

2  function exception bars Plaintiffs' claims.

3      **B.    Plaintiffs' claims relating to the decision to transfer A.A. to the custody of
4          ORR are barred by the FTCA's exception for actions taken while
           reasonably executing the law.**

5          Plaintiffs' claims relating to the decision to transfer A.A. to the custody of ORR are

6  independently precluded because the FTCA prevents the United States from being held liable

7  for "[a]ny claim based upon an act or omission of an employee of the Government, exercising

8  due care, in the execution of a statute or regulation, whether or not such statute or regulation

9  be valid." 28 U.S.C. § 2680(a). Thus, "[w]here government employees act pursuant to and

10  in furtherance of regulations, resulting harm is not compensable under the act[.]" *Dupree v.*

11  *United States*, 247 F.2d 819, 824 (3d Cir. 1957); *see also Accardi v. United States*, 435 F.2d

12  1239, 1241 (3d Cir. 1970) (claim based on "enforcement of 'rules and regulations'" barred

13  by § 2680(a)).

14          This exception "bars tests by tort action of the legality of statutes and regulations."

15  *Dalehite v. United States*, 346 U.S. 15, 33 (1953); *see also* H.R. Rep. No. 77-2245, 77th

16  Cong., 2d Sess., at 10 (noting that it was not "desirable or intended that the constitutionality

17  of legislation, or the legality of a rule or regulation should be tested through the medium of

18  a damage suit for tort"); *Powell v. United States*, 233 F.2d 851, 855 (10th Cir. 1956) (FTCA

19  does not waive sovereign immunity for claims based on employees' acts "performed under

20  and in furtherance of the regulation . . . even though the regulation may be irregular or

21  ineffective"). Thus, where a government employee's actions are authorized by statute or

22  regulation – even if that statute or regulation is later found unconstitutional or invalid – the

23  claim must be dismissed for lack of subject matter jurisdiction. S*ee Borquez v. United States*,

24  773 F.2d 1050, 1052-53 (9th Cir. 1985); *FDIC v. Citizens Bank & Trust Co. of Park Ridge,*

25  *Ill.*, 592 F.2d 364, 366 (7th Cir. 1979); *Sickman v. United States*, 184 F.2d 616, 619 (7th Cir.

26

27  ---
[5] *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020); *Nunez Eueeda v. United*
28  *States*, No. 2:20-cv-10793, 2021 WL 4895748, *3 (C.D. Cal. Apr. 27, 2021); *C.M. v. United*
   *States*, No. CV-19-5217, 2020 WL 1698191, *4 (D. Ariz. Mar. 30, 2020).

1    1950).

2    The United States is required to "transfer the custody" of children to the care of ORR

3    "not later than 72 hours after" determining that there is no parent available to provide care

4    and physical custody absent exceptional circumstances. 8 U.S.C. § 1232(b)(3). In this case,

5    the government made the determination that F.R. was unable to provide care and physical

6    custody for A.A. because it had previously made the discretionary decisions to refer F.R. for

7    criminal prosecution, to transfer him to the custody of USMS, and to detain him in a secure

8    immigration detention facility. Once each of those protected discretionary determinations

9    had been made, the TVPRA – which Plaintiffs do not challenge – required that A.A. be

10   transferred to ORR custody. The enforcement of that statutory command cannot form the

11   basis of an FTCA claim.[6]

12   **C.    Plaintiffs' claims are barred because there is no private person analogue.**

13   Plaintiffs' claims also fail because the government acts that Plaintiffs challenge have

14   no private-person analogue. The FTCA's waiver of sovereign immunity is limited to

15   "circumstances where the United States, if a private person, would be liable to the claimant

16   in accordance with the law of the place where the act or omission occurred." 28 U.S.C.

17   § 1346(b)(1). The statute authorizes tort recovery against the United States only "in the same

18   manner and to the same extent as a private individual under like circumstances." 28 U.S.C.

19   § 2674. The FTCA does not waive sovereign immunity for claims against the United States

20   based on governmental "action of the type that private persons could not engage in and hence

21   could not be liable for under local law." *Chen v. United States*, 854 F.2d 622, 626 (2d Cir.

22   1988) (internal quotes omitted). The FTCA "requires a court to look to the state-law liability

23

---

24   [6] In reaching the contrary conclusion, district courts have stated that there is no statute or
25   regulation "requiring the separation of Plaintiffs upon their entry into the country." *A.P.F.*,
     492 F. Supp. 3d at 996; *see Nunez Euceda*, 2021 WL 4895748, *4 (similar). But, as just
26   described, federal law does require that children be placed into ORR custody if their parents
     are unable to provide care and physical custody. For the reasons described above, the
27   decision to detain those parents for prosecution, and to detain them pending removal, is a
28   quintessentially discretionary one. As to the other cases decided in this District, the plaintiffs
     were not charged with any crime, and those decisions are distinguishable on that basis.

of private entities, not to that of public entities, when assessing liability under the FTCA." *United States v. Olson*, 546 U.S. 43, 45-46 (2005). Though the private analogue need not be exact, a plaintiff must offer "a persuasive analogy" showing that the government actor sued would be subject to liability under state law if it were a private person. *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 650 (9th Cir. 1992).

Because only the federal government has the authority to enforce federal criminal and immigration laws and make detention determinations, there is no private-person analogue that would support a claim under the FTCA. The alleged harms here stem from the federal government's decision to enforce federal immigration laws, criminally prosecute certain individuals, and hold parents in custody pending immigration proceedings or prosecution, resulting in their children's placement in the care and custody of ORR. The United States has not waived its sovereign immunity for such decisions to enforce federal law, as they have no private-person counterpart. *See, e.g.*, *Elgamal v. Bernacke*, 714 F. App'x 741, 742 (9th Cir. 2018) ("[B]ecause no private person could be sued for anything sufficiently analogous to the negligent denial of an immigration status adjustment application, that claim must be dismissed as well."); *Elgamal v. United States*, No. 13-00967, 2015 WL 13648070, at *5 (D. Ariz. July 8, 2015) (recognizing that "immigration matters" are "an inherently governmental function"); *Bhuiyan v. United States*, 772 F. App'x 564, 565 (9th Cir. 2019) ("[T]here is, as a general matter, no private analogue to governmental withdrawal of immigration benefits.").

The court in *C.M.* and *A.P.F.* found a private-person analogue to nursing home employees, relying on *Estate of Smith v. Shartle*, No. CV-18-00323-TUC-RCC, 2020 WL 1158552 at *2 (D. Ariz. Mar 10, 2020), a case involving the Bureau of Prisons' duty toward inmates in its care. *See C.M.*, 2020 WL 1698191, at *3; *A.P.F.*, 492 F. Supp. 3d at 995. The *Shartle* court found an analogy to a nursing home's duty of care in Ariz. Rev. Stat. § 46-455, which imposes civil liability on nursing home employees who cause or permit the life of a vulnerable adult to be endangered by neglect. Defendant respectfully submits that a nursing home's duty to safeguard against neglect is wholly different from the federal government's enforcement of federal criminal and immigration laws and does not provide the "persuasive

analogy" required for jurisdiction under the FTCA.

**D.     Plaintiffs' claims are impermissible direct liability or systemic tort claims.**

The FTCA's limited waiver of sovereign immunity allows a plaintiff to sue the United States for damages arising from certain torts committed by federal employees acting within the scope of their employment. *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995) (citing 28 U.S.C. § 1346(b)). As the Ninth Circuit has held, the terms "person" and "employee of the government," as used in the FTCA, mean individuals and natural persons, not institutions or corporate entities. *Adams v. United States*, 420 F.3d 1049, 1052-55 (9th Cir. 2005). Hence, a plaintiff cannot assert "systemic" claims or seek to hold the United States directly liable under the FTCA but must instead allege tortious conduct by individual federal employees, acting within the scope of their employment, for whom the United States has assumed liability for under the FTCA. *See, e.g.*, *Lee v. United States*, No. CV 19-08051-PCT-DLR (DMF), 2020 WL 6573258, at *6 (D. Ariz. Sept. 18, 2020) (applying *Adams* and dismissing claims of "generalized negligence" asserted against staff and employees of federal institutions "as a whole" for lack of jurisdiction).

Here, as in *Lee*, Plaintiffs seek to raise direct liability and institutional tort claims against the United States. Throughout the Complaint, Plaintiffs attribute the alleged tortious conduct to the government as a whole, referring throughout to "the United States government," "the U.S. government," and "the government," rather than specific tortious conduct on the part of specific federal employees for whom the United States must assume liability. *See, e.g.*, Compl. ¶ 3, 4, 5, 6, 20, 39, 41, 44. The FTCA's limited waiver of sovereign immunity does not encompass such "systemic," institutional tort claims or "generalized theories" of tortious conduct "asserted against the staff and employees of federal institutions as a whole." *Lee*, 2020 WL 6573258, at *6.

**V.     CONCLUSION.**

For the foregoing reasons, Defendant requests that this action be dismissed for lack of subject matter jurisdiction.

RESPECTFULLY SUBMITTED this 4th day of February, 2022.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GARY M. RESTAINO
United States Attorney
District of Arizona

s/*Katherine R. Branch*
KATHERINE R. BRANCH
Assistant United States Attorney
*Attorneys for Defendant*