Kathleen E. Brody (026331)
kathy@mscclaw.com
Molly Brizgys (29216)
molly@mscclaw.com
MITHCELL | STEIN | CAREY | CHAPMAN, PC
One Renaissance Square
2 North Central Avenue, Suite 1450
Phoenix, AZ 85004
Telephone: (602) 358-0293
Facsimile: (602) 358-0291

Peter Rukin (SBN 178336)*
prukin@rukinhyland.com
Jessica Riggin (SBN 281712)*
jriggin@rukinhyland.com
Valerie Brender (SBN 298224)*
vbrender@rukinhyland.com
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612
Telephone: (415) 421-1800
Facsimile: (415) 421-1700

(*Admitted Pro hac vice)

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| F.R., on his own behalf and on behalf of his minor child, A.A., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. CV-21-00339-PHX-DLR <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |

## I.   INTRODUCTION

A.A. was six years old when immigration officials forcibly separated him from his father, F.R., as part of the U.S. Government's policy to intimidate and deter migrants from lawfully seeking refuge in the United States. As intended, the Government's admitted practice of separating children from their families at the United States-Mexico border caused F.R. and A.A. immense suffering. Indeed, the Government now concedes that Plaintiffs' separation was a "human tragedy." Mot. at 2.

As a result, Plaintiffs bring suit under the Federal Tort Claims Act ("FTCA"), alleging claims under Arizona law. In moving to dismiss the Complaint, the Government ignores—or outright misstates—the relevant legal standards and mischaracterizes Plaintiffs' claims. The Court should reject the Government's flawed arguments and allow Plaintiffs claims—as Plaintiffs have pled them—to proceed.

The Government does not dispute that Plaintiffs' claims are cognizable under Arizona law. Instead, the Government asserts Plaintiffs' claims are not actionable under the FTCA. As the Government acknowledges, the Hon. Susan R. Bolton in this District Court, and other courts, have already rejected these arguments. *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996–97 (D. Ariz. 2020); *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020) ("*C.M. I*"); *Nunez Euceda v. United States*, No. 2:20-cv-10793-VAP-GJSx, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021).

The Government first asserts that it is immune from liability because of the FTCA's "discretionary function" and "due care" exceptions ("DFE" and "DCE," respectively). But neither exception applies. It is black letter law that, because government officials lack discretion to violate the Constitution, the DFE cannot shield unconstitutional conduct from liability. And there is no doubt that Plaintiffs' forced and prolonged separation violated the Constitution. As courts in the District of Arizona, the Southern and Central Districts of California, and the District of Columbia have concluded, the family separation practice at issue "shocks the conscience," serves no

- 1 -

1  legitimate government purpose, and violates due process. The DFE therefore does not bar
2  Plaintiffs' claims.

3       Neither does the DCE. That exception applies only where the Government is
4  carrying out a duty imposed by statute or regulation. But here the Government concedes
5  that the separation was not required by statute. As the Government's opening papers
6  state, "President Biden took action to repudiate the policies that led to Plaintiffs'
7  separation and to reunify the families that were affected by those policies." Mot. at 8. The
8  fact that the current administration has abandoned the policy of forced separation
9  establishes that the practice was not mandated by statute or regulation. Accordingly, the
10 DCE does not apply.

11      Next, the Government argues that Plaintiffs' claims do not satisfy the FTCA's
12 private analogue requirement. FTCA actions are available where the United States, if a
13 private person, would be liable. The Government argues that, because only it can enforce
14 immigration laws, there is no private-person analogue for its tortious separation of
15 Plaintiffs. But the Government misunderstands the test. The question is not whether
16 private individuals could operate in a context similar to the government, but rather
17 whether private individuals could be held liable in tort for analogous conduct. The
18 conduct at issue is the forced and prolonged separation of families. As courts have
19 already determined, private individuals are liable for such conduct under Arizona law.

20      Additionally, the Government asks the Court to dismiss Plaintiffs' claims on the
21 grounds that there can be no FTCA liability where there are joint tortfeasors, calling such
22 litigation "systemic." There is, however, no such rule. The only cases the Government
23 cites pertain to the availability of tort defenses, not sovereign immunity, and are thus
24 inapposite.

25      Finally, the Government's repeated reliance on cases supporting its discretion to
26 detain immigrants and to prosecute is misplaced. The Government's general detention
27 and prosecutorial powers are not at issue here. Rather, Plaintiffs challenge a specific
28 unconstitutional policy that federal officials adopted and implemented with the purpose

1    to inflict emotional distress on Plaintiffs and to leverage Plaintiffs' suffering to deter

2    other people from immigrating to this country. This cruelty was an intended feature, not a

3    bug, of the Government's plan. As Judge Bolton has previously determined, the

4    Government's conduct is actionable under the FTCA. The Court should reach the same

5    conclusion again here and deny the Government's Motion to Dismiss.

6    **II.    FACTUAL ALLEGATIONS**

7        **A.    The Government's family-separation practices.**

8        Between the summer of 2017 and June 26, 2018, the United States separated

9    thousands of children from their parents who crossed the U.S.-Mexico border. Compl. ¶

10   17. The purpose of this executive policy ("Family Separation Policy") was to cause

11   enormous suffering and harm to these migrants, thereby deterring them and others from

12   seeking refuge in the United States. *Id.* The Family Separation Policy violated the

13   Constitution and statutory and common law. *Id.*

14       Prior to the creation of the Family Separation Policy, parents and children were

15   detained together (if at all) when federal immigration officials apprehended parents with

16   their children. *See* Compl. ¶ 29. For example, when DHS apprehended adults with

17   children crossing the border, DHS typically detained and administratively removed the

18   adults and children together under civil immigration proceedings or would provide the

19   family unit adult with a Notice to Appear before an Immigration Judge and then release

20   the family to remain in the United States until the adult's immigration hearing date. *Id.*

21   This long-standing DHS practice of deferring to civil immigration proceedings and

22   enforcement, rather than having the DOJ criminally prosecute adults entering the United

23   States with children as a family unit, was related to concerns about separating children

24   from their family during the pendency of the parent's prosecution. *Id.*

25       When the U.S. government began its Family Separation Policy in 2017, it knew

26   that it would cause harm. *See* Compl. ¶¶ 20–24. For example, in 2016, the DHS Advisory

27   Committee on Family Residential Centers concluded that "separation in these

28   circumstances raises serious concerns and violates the best interests of the child—which

- 3 -

requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members." *Id.* ¶ 20. Commander Jonathan White, former Deputy Director of the Office for Refugee Resettlement ("ORR") for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, in early 2017, he warned the Government that the Family Separation Policy "would be inconsistent with [the Government's] legal requirement to act in the best interest of the child and would expose children to unnecessary risk of harm." *Id.* ¶ 21. White also acknowledged in his testimony that "separation of minors from their parents involves a risk of severe psychological trauma." *Id.* Further, the American Academy of Pediatrics (AAP) publicly opposed the Family Separation Policy warning that proposals to separate children from their families "as a tools of law enforcement to deter immigration are harsh and counterproductive." *Id.* ¶ 22. In another policy statement, the AAP cautioned that "separation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for safety of the child at the hand of [the] parent." *Id.* ¶ 23.

Despite these and other warnings, in 2017, the U.S. Government began a yearlong initiative to deter potential migrants (including migrants lawfully seeking asylum) on the Southwest border by forcibly separating families. Compl. ¶ 24. On April 11, 2017, the Attorney General, Jeff Sessions, issued a memorandum instructing federal prosecutors to prioritize prosecution of certain immigration offenses, including misdemeanors that had not previously been an enforcement priority. *Id.* ¶ 25. Under these policies, the Government prioritized the prosecution of misdemeanor charges of improper entry under 8 U.S.C. § 1325, including the prosecution of parents who crossed the border into the United States with young children. *Id.* ¶ 26. With the increased prosecution of parents came the practice of separating children from their parents. *See id.* When a child and parent were apprehended together by immigration authorities, DHS separated the family, with the parent being placed in the custody of the U.S. Marshals Service within the DOJ to await prosecution for immigration offenses. *Id.* The child was then erroneously treated as an unaccompanied minor and transferred to the ORR. *Id.*

The specific intention of the Government in creating, piloting, and broadening the Family Separation Policy was to cause severe trauma and harm to ultimately deter families from migrating to the United States. *See* Compl. ¶¶ 30–32. For example, a December 2017 joint DOJ and DHS memorandum noted that the "prosecution of family units," resulting in separation, "would be reported by media and . . . have substantial deterrent effect" on future migration. *Id.* ¶ 30. On May 11, 2018, John Kelly, President Trump's then-Chief of Staff, stated on NPR that "a big name of the game is deterrence . . . . It could be a tough deterrent—would be a tough deterrent." *Id.* When the interviewer asked about whether it was "cruel and heartless" to take a parent away from their children, he replied, "[t]he children will be taken care of—put into foster care or whatever." *Id.* And on June 19, 2018, Steve Wagner, Assistant Secretary of HHS said, "[w]e expect that the new policy will result in a deterrence effect . . . ." *Id.* Even after a federal judge enjoined the Family Separation Policy because it likely violated families' due process rights to family integrity, President Trump continued to underscore the policy's deterrent effect. *Id.* ¶ 31. When speaking with reporters at the White House on October 13, 2018, he said: "If they feel there will be separation, they don't come." *Id.* And on April 28, 2019—after the Family Separation Policy had purportedly ended— President Trump told Fox News host Maria Bartiromo, "Now you don't get separated, and while that sounds nice and all, what happens is . . . literally you have ten times as many families coming up because they're not going to be separated from their children[.] . . . It's a disaster." *Id.*

In June of 2018, the Hon. Dana M. Sabraw enjoined the U.S. government's Family Separation Policy and practice and found that a plaintiff class, comprised of class members like F.R. and A.A., was likely to succeed on their claim that the U.S. government violated migrant families' due process rights to family integrity through implementation of the Family Separation Policy. Compl. ¶ 55 (citing to *Ms. L. v. U.S Immigration and Customs Enforcement ("ICE")*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), *modified* 330 F.R.D. 284 (S.D. Cal. 2019), and *enforcement granted in part,*

denied in part sub nom. *Ms. L. v. U.S. Immigration and Customs Enforcement*, 415 F.
Supp. 3d 980 (S.D. Cal. 2020)("*Ms.L. I*"). Judge Sabraw ordered that the U.S.
government cease detaining migrant parents apart from their minor children absent a
determination that the parent is unfit or presents a danger to the child. Compl. ¶ 55. In
reaching this holding, Judge Sabraw observed that the U.S. government separated
families without an effective system or procedure for tracking children after they were
separated, without enabling communication between the parents and children, and
without reuniting the parents and children, even after the parents returned to immigration
custody following or completing criminal sentences. *Id.* ¶ 56. Judge Sabraw found these
practices "so egregious, so outrageous, that it may fairly be said to shock the
contemporary conscience." *Id.* (citing to *Ms. L. I*, 310 F. Supp. 3d at 1145). F.R. and A.A.
were subjected to these practices, as described below.

Judge Sabraw subsequently issued a preliminary injunction and accompanying
order granting class certification. *See Ms. L.I*, 415 F. Supp. 3d 980. The Court made clear
that being charged and convicted of illegal entry into the U.S. under 8 U.S.C. § 1325 was
not a basis for exclusion from the class. *Id.* at 994.[1]

**B.    The Plaintiff family's separation.**

Plaintiff family is a father and minor son who fled their home country of Honduras
due to economic hardship. Compl. ¶ 33. They traveled through Sonora, Mexico, and
entered the United States at the U.S.-Arizona border around early March of 2018. *Id.* ¶
34. Subsequently, F.R. and A.A. were detained by a CBP officer, taken to an office, and
later transferred to a holding center that detainees frequently called "the icebox" ("*la
hielera*") because of its cold temperatures. *Id.* ¶ 35. CBP confiscated F.R.'s identification,
A.A.'s birth certificate, and the extra clothes that Plaintiffs brought with them. *Id.* ¶ 36.

---

[1] However, being charged and convicted of illegal re-entry into the U.S. under 8
U.S.C. § 1326 was a basis for exclusion from the class. *See id.* Plaintiff F.R. was referred
for criminal prosecution under 8 U.S.C. §§ 1326 and 1325 in 2018. *See* Dkt. 30-1 ¶ 8. But
he was only charged with and plead guilty to 8 U.S.C. § 1325. *See id.* at ¶ 11.

1    Plaintiffs were forced to sit on cold floors without any beds or blankets and with all the
2    lights on. *Id.* They were offered only soup and water to eat and drink. *Id.*

3           After approximately 10 to 12 hours, an immigration official arrived and said that
4    she was there to take A.A. away. Compl. ¶ 37. The immigration officer then forcibly
5    separated A.A. from F.R, despite F.R.'s pleas to not take his son from him. *Id.* Both A.A.
6    and F.R. cried as the immigration officer forcibly removed A.A. from F.R. *Id.* No U.S.
7    government official told F.R. where A.A. was going to be taken. *Id.* ¶ 38. The officer
8    who separated A.A. from F.R. stated only that she was taking him to an unknown
9    location. *Id.* F.R. had informed the U.S. government upon entry that he had an aunt who
10   lived in Washington; however, the U.S. government made no effort to place A.A. with
11   this family member. *Id.* Other than the U.S. government's Family Separation Policy,
12   there was no basis for removing A.A. from F.R. *Id.* ¶ 39. For example, in conducting the
13   separation, the U.S. government did not allege or make any showing that F.R. was unfit
14   to care for or posed a danger to A.A. Nor did F.R. have a criminal or medical history
15   warranting separation. *Id.*

16          It took F.R. approximately 15 to 16 days to learn where his son was placed.
17   Compl. ¶ 40. None of the available immigration officers with whom he was detained
18   would volunteer this information. *Id.* F.R. finally learned that his son had been placed in
19   a shelter for minors in Texas, but he was not informed of the exact location of this
20   shelter, which should have been in the possession of the U.S. government. *Id.* While
21   separated, F.R. recalls Government officials limiting calls with A.A. to once a week for
22   15 minutes. *Id.* ¶ 41. Both F.R. and A.A. cried throughout each call. *Id.* During their
23   separation, a woman from the shelter locked A.A. in a room by himself on several
24   occasions in order to punish him *Id.* ¶ 42.

25          After immigration officials forcibly took A.A., F.R. was extremely distraught.
26   Compl. ¶ 43. He cried, wanted to kick himself, felt destroyed, and thought about hurting
27   or killing himself. *Id.* During the two weeks that F.R. did not know where his son was
28   and could not get in contact with him, and F.R. worried constantly about A.A.'s physical

safety, mental health, and treatment. *Id.* ¶ 44. After more than a month in detention, the U.S. government deported F.R. to Honduras. *Id.* It was extremely distressing when F.R. realized that the U.S. government would not reunite him with his son upon deportation. *Id.* He was heartbroken and haunted by A.A. pleading over the phone, "Papá no me dejes" ("Dad, don't leave me."). *Id.*

Once F.R. was back in Honduras, U.S. officials at the children's shelter where A.A. was being held told F.R.'s wife that F.R. could not speak to A.A. because he had left A.A. in the United States and thus lost his rights as a father. Compl. ¶ 45. Over the next two months, F.R. was only permitted to speak with his son on the phone once, approximately eight days before F.R. was reunited with his son. *Id.* During the time that A.A. was separated from his family, no one ever told F.R. when they would be reunited or how long A.A. would be in U.S. Government custody. *Id.* ¶ 46.

After being separated from his family for approximately 100 days, A.A. was finally returned to Honduras and able to reunite with his family. Compl. ¶ 48. Upon being reunited, F.R. and A.A.'s family immediately noticed that A.A. was not the same—A.A. was severely impacted by the traumatic separation he was forced to endure. *Id.* ¶¶ 48–52. For example, A.A. has had trouble sleeping, concentrating, has become more erratic and aggressive, and has struggled with bed wetting. *Id.* ¶ 49. F.R. also continues to suffer as a result of the separation from his son; living every day with the trauma of having his son ripped from his arms. *Id.* ¶ 53.

## III.   ARGUMENT

### A.   Legal Standard.

Defendant moves to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). On a motion to dismiss, "the court must construe the complaint in the light most favorable to the plaintiff[s], taking all [their] allegations as true and drawing all reasonable inferences from the complaint in [their] favor." *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). The "'complaint should be read as a whole, not parsed piece by piece to determine whether

1    each allegation, in isolation, is plausible.'" *Terraza v. Safeway Inc.*, 241 F. Supp. 3d

2    1057, 1081 (N.D. Cal. 2017) (quoting *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585,

3    594 (8th Cir. 2009)); *see also Shosie v. City of Tucson*, CV 15-196-TUC-CKJ, 2015 WL

4    5607654, at *2 (D. Ariz. Sept. 24, 2015) (citing *Safe Air for Everyone v. Meyer*, 373 F.3d

5    1035, 1039 (9th Cir. 2004)). Evaluation of a complaint upon a motion to dismiss is "a

6    context-specific task that requires the reviewing court to draw on its judicial experience

7    and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

8         Plaintiffs' causes of action arise under the FTCA. While the Government is

9    generally immune from liability absent its consent, *United States v. Mitchell*, 445 U.S.

10   535, 538 (1980), the FTCA provides that consent "under circumstances where the United

11   States, if a private person, would be liable to the claimant in accordance with the law of

12   the place where the act or omission occurred." *United States v. Olson*, 546 U.S. 43, 44

13   (2005) (quoting 28 U.S.C. § 1346(b)(1)). The FTCA's waiver of sovereign immunity

14   contains a number of exceptions. Because the FTCA is a remedial statute, those

15   exceptions must be read narrowly, *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th

16   Cir. 2002), and the Government bears the burden of proving they apply. *Prescott v.

17   United States*, 973 F.2d 696, 701–02 (9th Cir. 1992) (citing 28 U.S.C. § 1346(b)).

18   **B.    The discretionary function exception does not apply here.**

19        The Government first argues that its actions are protected by the discretionary

20   function exception ("DFE"), which bars claims that (1) "involve an element of judgment

21   or choice," and (2) are "based on considerations of public policy." *United States v.

22   Gaubert*, 499 U.S. 315, 322-23 (1991). But the DFE "does not shield unconstitutional

23   government conduct." *A.P.F.*, 492 F. Supp. 3d at 996 (citing *Nurse v. United States*, 226

24   F.3d 996, 1002 n.2 (9th Cir. 2000)). The Government must make both showings. It can

25   make neither.

26        **1.    Separating F.R. and A.A. was not a discretionary act because it
              violated the Constitution.**

27        The Government's argument fails as a threshold matter because the forcible,

28

1    prolonged separations that Plaintiffs challenge here were unlawful and thus non-

2    discretionary. "[F]ederal officials do not possess discretion to violate constitutional

3    rights." *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) (internal quotations omitted).

4    Where, as is true here, Plaintiffs allege that such rights are violated, the discretionary

5    function exception does not apply. *See id.*

6           Indeed, Judge Bolton of this Court has already **twice** denied the Government's

7    motions to dismiss in related cases on the grounds that the Government's practice of

8    separating families is likely unconstitutional, and therefore the discretionary function

9    exception does not apply. *See A.P.F.,* 492 F. Supp. 3d at 996; *C.M. I*, 2020 WL 1698191,

10   at *4; *see also Nunez Euceda*, 2021 WL 4895748, at *3.  In *C.M. I*, Judge Bolton

11   concluded that plaintiffs had "plausibly alleged that the government's separation of their

12   families violated their constitutional rights, which is not shielded by the discretionary

13   function exception." 2020 WL 1698191, at *4. In *A.P.F.*, Judge Bolton reached a similar

14   conclusion, holding that, "[b]ecause government officials lack discretion to violate the

15   Constitution, the discretionary function exception cannot shield conduct related to the

16   government's likely unconstitutional separation of plaintiffs." *A.P.F.*, 492 F. Supp. 3d at

17   996. And in *Nunez Euceda*, the court concluded that plaintiff "ha[d] plausibly alleged that

18   the government's Policy [of separating families at the border] violated his constitutional

19   rights" and that, as a result, "the discretionary function [exception] d[id] not bar [his]

20   claims." *Nunez Euceda*, 2021 WL 4895748, at *3.

21          The government advances no persuasive arguments as to why the Court should

22   reach a different result here. Nor can it. The "substantive due process right to family

23   integrity . . . is well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th

24   Cir. 2011). To determine whether a substantive due process violation has occurred, a

25   court should inquire if the "[b]ehavior of the governmental officer [was] so egregious, so

26   outrageous, that it may fairly be said to shock the contemporary conscience." *Cty. of*

27   *Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

28

1    The allegations here easily meet this standard. Plaintiffs, a father and his child,

2    were kept in a holding center that was so cold detainees called it "the icebox." Compl. ¶

3    35. Plaintiffs were forced to sit on cold floors without any beds or blankets and with all

4    the lights on, and were offered only soup and water to eat and drink. *Id.* ¶ 36. After

5    approximately 10 to 12 hours under these conditions, an immigration officer forcibly

6    separated A.A. from his father, F.R. *Id.* ¶ 37. Crying, A.A. pleaded with his father not to

7    leave him in the United States alone. *Id.* No U.S. official told F.R. where A.A. was going

8    to be taken; after 15 to 16 days, F.R. finally learned that his son was placed in a shelter

9    for minors in Texas. *Id.* ¶ 40. No exact location was given, and F.R. and A.A. were only

10   permitted to speak to each other through a call once a week for 15 minutes. *Id.* ¶ 41. F.R.

11   was removed from the U.S. and sent to Honduras without A.A., who remained in a

12   shelter in the U.S. *Id.* ¶ 44. They were only reunited after they had been separated for

13   approximately 100 days. *Id.* ¶ 48. During their separation, A.A. was locked in a room by

14   himself on several occasions. *Id.* ¶ 42. Upon considering these same practices, the

15   Southern District of California held:

16          These allegations sufficiently describe government conduct that arbitrarily
            tears at the sacred bond between parent and child, and is emblematic of the
17          "exercise of power without any reasonable justification in the service of an
            otherwise legitimate governmental objective[.]" . . . Such conduct, if true,
18          as it is assumed to be on the present motion, is brutal, offensive, and fails to
            comport with traditional notions of fair play and decency. At a minimum,
19          the facts alleged are sufficient to show the government conduct at issue
            "shocks the conscience" and violates Plaintiffs' constitutional right to
20          family integrity.

21   *Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1167 (S.D. Cal.

22   2018)("*Ms. L II*") (citation omitted).

23          Tellingly, the Government cannot identify a single case—from any jurisdiction—

24   concluding that forcibly separating families in circumstances analogous to those alleged

25   in the Complaint is constitutional.[2] To the contrary, every court that has considered the

26   _____
            [2] The only court that has concluded the DFE applies to the Government's family-
27   separation practice never considered whether the constitutionality of the practice made
     the DFE inapplicable. *See Peña Arita v. United States*, 470 F. Supp. 3d 663, 690 (S.D.
28   Tex. 2020). Plaintiffs note that—as the Ninth Circuit has held, *Galvin v. Hay*, 374 F.3d

                                          - 11 -

1  constitutionality of the Government's past practice of separating families at the border

2  has found that the practice is likely unconstitutional. As in *Ms. L. II*, in *Jacinto-Castanon*

3  *de Nolascov v. U.S. Immigr. & Customs Enf't*, the court "easily conclude[d]" that

4  plaintiffs were "likely to succeed on . . . their substantive due process claim that their

5  continued separation . . . violate[d] their right to family integrity under the Fifth

6  Amendment." 319 F. Supp. 3d 491, 499 (D.D.C. 2018). And, in *J.S.R. by and through*

7  *J.S.G. v. Sessions*, which considered the same family-separation practice, even the

8  Government "agree[d] that a constitutional violation occurred when the Government

9  separated children from their parents." 330 F. Supp. 3d 731, 741 (D. Conn. 2018). As

10  Plaintiffs note in their Complaint, the *Ms. L. I* court ultimately enjoined the

11  Government's family-separation practice, holding that "a finding of likelihood of

12  success" on the substantive due process claim was "assured" in that case. *Ms. L. I*, 310 F.

13  Supp. 3d at 1145.

14      The Government is asking this Court to break new ground. To hold that the DFE

15  applies, the Court would need to conclude—at this early stage of the case, when the

16  Court must accept Plaintiffs' allegations as true and draw all reasonable inferences in

17  their favor—either that the Government's separation of the Plaintiff family was

18  constitutional or that the DFE applies notwithstanding the likely unconstitutionality of

19  that conduct. If this Court were to reach either conclusion, it would be the first. The

20  uniform weight of authority in this District Court and Circuit—*C.M.*, *A.P.F.*, *and Nunez*

21  *Escueda*—all hold that allegations of this type plausibly allege a constitutional violation.

22  And the Ninth Circuit has long held that "[f]ederal officials do not possess discretion to

23  violate constitutional rights." *Galvin*, 374 F.3d at 758.

### 2.  Plaintiffs are not required to show their constitutional right to family integrity was clearly established.

25      Recognizing that existing law does not support its position that the DFE applies,

26

27  _____

28  739, 758 (9th Cir. 2004)—the fact that the challenged conduct was unconstitutional means that it necessarily falls outside the scope of the DFE.

- 12 -

the Government tries to create entirely new law by urging the Court to hold that the Government has discretion to violate a constitutional right unless the right was "clearly-established" when the violation occurred. Mot. at 19-20. That is a standard that courts apply when considering qualified immunity defenses in suits against government officials in their individual capacity,[3] not when considering the DFE in suits against the Government arising under the FTCA, and it is an improper standard to apply to FTCA litigation.

The Ninth Circuit has determined that the DFE does not apply where Plaintiffs' allegations, if taken as true, demonstrate that Government officials violated their constitutional rights, even if the relevant constitutional rights were not "clearly established" at the time of the conduct. In *Galvin v. Hay*, the plaintiff brought both a *Bivens* claim against individual officers and an FTCA claim against the Government. *Galvin*, 374 F.3d at 744. The Ninth Circuit held that the defendant officials had violated constitutional rights, but were entitled to qualified immunity because the constitutional right was not clearly established. *Id.* at 757. But, and in contrast, the Ninth Circuit also held that the DFE did not shield the Government from FTCA liability for that same conduct because the "defendants violated the Constitution" and "'government conduct cannot be discretionary if it violates a legal mandate.'" *Id.* at 758 (quoting *Nurse*, 226 F.3d at 1002).[4] Similarly, in *Nurse*, the Ninth Circuit reversed a district court's dismissal of FTCA claims even though it could "[]not determine at th[at] stage of the proceedings whether the acts of the . . . defendants violated the Constitution, and, if so, what specific constitutional mandates they violated." *Nurse*, 226 F.3d at 1002. And while the court did not "make any decision regarding the level of specificity with which a constitutional proscription must be articulated in order to remove the discretion of a federal actor," it

---

[3] The government cites qualified immunity cases without alerting the Court to their inapplicability here. *E.g.,* Mot. at 19 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) and *Wilson v. Layne*, 526 U.S. 603, 614-615 (1999)).

[4] *Galvin* affirmed the dismissal of the FTCA claim on unrelated grounds not applicable here.

1   held that the issue should be decided "as [a] case proceeds toward trial," not on a motion

2   to dismiss. *Id.* at 1002 (concluding that the question of whether, and what provisions of,

3   the Constitution had been violated were "not questions that can always be easily

4   answered on a motion to dismiss").

5          Indeed, the Government points to no authority that has ever used the "clearly

6   established" standard when assessing whether the DFE applies. The D.C. Circuit, for

7   example, observed that it had "found no precedent in any circuit holding" that "principles

8   similar to those that undergird qualified immunity should extend to preserve

9   discretionary-function immunity for some unconstitutional acts." *Loumiet v. United*

10  *States*, 828 F.3d 935, 946 (D.C. Cir. 2016). The policy considerations that animated the

11  "clearly established" standard in qualified immunity cases simply do not apply to FTCA

12  claims. "[T]he premise of qualified immunity is that state officials should not be held

13  liable" (by which the court means ***personally*** liable) "for money damages absent fair

14  warning that their actions were unconstitutional," which is why constitutional rights must

15  be "clearly established" before they are actionable. *Sandoval v. Cty. of San Diego*, 985

16  F.3d 657, 674 (9th Cir. 2021), *cert. denied*, 142 S.Ct. 711 (2021). But that premise is

17  inapplicable here, where the Government, not individual officials, bears liability. Thus,

18  there is no legal basis to apply qualified immunity standards to Plaintiffs' claims.

19          **3.   Separating F.R. and A.A. was not based on considerations of public**
                **policy.**

20          Regardless of whether the Government's conduct was discretionary—which it was

21  not—the Government has failed to demonstrate that the forcible, prolonged separation of

22  Plaintiffs "implement[ed] social, economic or political policy considerations." *Nurse*, 226

23  F.3d at 1001. "It is not sufficient for the government merely to waive [sic] the flag of

24  policy as a cover for anything and everything it does that is discretionary in nature."

25  *Peterson v. Martinez*, No. 3:19-cv-01447-WHO, 2020 WL 999832, at *8 (N.D. Cal. Mar.

26  2, 2020). Because "the Government has the burden of proving the [DFE] applies . . . .

27  [t]here must be reasonable support in the record for a court to find, without imposing its

28

1    own conjecture, that a decision was policy-based or susceptible to policy analysis."

2    *Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1216 (9th Cir.

3    2001).

4              The Government's separation of Plaintiffs was not based on legitimate social,

5    economic, or political policy considerations. In general, there are very few legitimate

6    reasons to forcibly separate parent from child. The "cruelty of . . . separation of a parent

7    and child by the government" is only justified "in the most dreadful circumstances," such

8    as when the parent is "unwilling or unfit" to care for the child—circumstances that are

9    not present here. *D.J.C.V. v. U.S. Immigr. & Customs Enf't*, No. 18 Civ. 9115 (AKH),

10   2018 WL 10436675, at *1 (S.D.N.Y. Oct. 15, 2018). Unsurprisingly, courts that have

11   evaluated the Government's practice of separating families at the border have been

12   unable to discern any legitimate governmental objective the practice served. The *Ms. L. II*

13   court, for example, concluded that separating families at the border was "emblematic of

14   the exercise of power without any reasonable justification in the service of an otherwise

15   legitimate governmental objective." *Ms. L. II*, 302 F. Supp. 3d at 1167 (internal quotation

16   marks omitted). Tellingly, the Government's brief does not name a single policy

17   objective that was served by the forcible and prolonged separation of Plaintiffs.  That

18   fact, alone, strongly suggests the separations do not satisfy the second prong of the DFE.

19             Instead of clearly identifying which policy objectives Plaintiffs' separation

20   purportedly served and why those objectives satisfy the second prong of the DFE, the

21   Government vaguely asserts that it "spelled out the policies it sought to further" by

22   separating Plaintiff families in "a series of Executive Branch directives." Mot. at 14. But

23   those "directives" appear to concern prosecutorial and detention decisions (which is not

24   the tortious conduct challenged here) rather than the Government's practice of separating

25   families (which is the challenged conduct). *See id*. at 15-17. And the law of this Circuit

26   does not permit courts to infer that those policy justifications apply to family separations.

27   Instead, there must be support for that conclusion in the record. *See Marlys Bear Med.*,

28   241 F.3d at 1216.

Finally, the Government points to portions of the Complaint alleging that the Government's intent in separating Plaintiffs was to deter immigration. Mot. at 15-16. This is not a legitimate means to obtain that goal; "nothing in federal law suggests that deterring immigration by indefinitely separating families . . . is a compelling or legitimate government objective." *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 501–02. The Government's proffered objective therefore cannot satisfy the DFE's second prong. *See Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 537 (1988) ("[T]he discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." (emphasis added)); *Davis v. United States*, No. EDCV 07-481-VAP (OPx), 2009 WL 10674302, at *3 (C.D. Cal. Sept. 4, 2009) ("Congress did not mean to shield from judicial fact finding the use of its employees' discretion to engage 'illegitimate means . . . to fulfill impermissible ends . . . .'" (quoting *Sabow v. U.S.*, 93 F.3d 1445, 1456 (9th Cir. 1996)).

### 4. The Government mischaracterizes Plaintiffs' challenge to the Government's separation of father and son

The Government mischaracterizes Plaintiffs' core claim by arguing that Plaintiffs challenge the Government's efforts to "enforce the Nation's criminal laws," "decide whether to prosecute a case," and "determine where aliens are detained." Mot. at 14–15, 22. But Plaintiffs are not challenging this general conduct. Nor are they challenging the Government's general duties under the TVPRA to transfer unaccompanied minors to the ORR.[5] *See* Mot. at 22. F.R. and A.A. challenge Government officials' forcible and

---

[5] The Government tries to distinguish Judge Bolton's prior rulings on the grounds that it now cites the TVPRA as grounds for the separation. Mot. at 22 n. 6. However, as the Court in *Ms. L II* acknowledged, "[a] policy of family separation to serve 'ulterior law enforcement goals' admittedly would be 'antithetical to the child welfare values' imposed on government actors by the TVPRA." 302 F. Supp. 3d at 1166 (citing to the U.S. Government's opposition to Ms. L's preliminary injunction order). There, the Court found that the Government's Family Separation Policy "'shocks the conscience' and violates Plaintiffs' constitutional right to family integrity." *Id.* at 1167. And as noted above, the *Ms. L* class included those who had been charged under § 1325. Indeed, here, the Government does not even try to rationalize A.A.'s 100-day separation from F.R. when F.R. was only sentenced to five days with time served under § 1325.

prolonged separation F.R. and A.A., the practice of which the Government acknowledges was a "human tragedy." Mot. at 2. That distinction is crucial. While it is not inherently unconstitutional to enforce criminal laws, it *was* unconstitutional to forcibly separate Plaintiffs. Indeed, Judge Bolton has already twice denied motions to dismiss on the grounds that similar separations were likely unconstitutional. *See A.P.F.*, 492 F. Supp. 3d at 996; *C.M.I*, 2020 WL 1698191, at *4. *See also Nunez Euceda v. United States*, 2021 WL 4895748, at *3 ("Indeed, courts within this circuit have held that 'the government's practice of separating families, and the procedures used to implement this practice, likely violated due process.'").

Furthermore, like in *A.P.F.* and *C.M.*, the Government here tries to recast "Plaintiffs' factual allegations as standalone claims" (*see A.P.F.*, 492 F. Supp. 3d at 996–97) by arguing that it has some discretion over certain immigration decisions, and it therefore had authority to unlawfully separate A.A. and F.R. *See* Mot. at 22. But Plaintiffs are the "masters of the complaint" and choose which claims to assert. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 395 (1987). The Government cannot mold Plaintiffs' claims to fit its preferred defenses. It must craft its defenses to address the claims. *See C.M. I*, 2020 WL 1698191, at *4 ("To the extent the United States asks the Court to parse the Complaint to assess whether claims with respect to individual factual allegations are barred, the Court declines to do so."). The Court should reject similar attempts here.

**C.    The due care exception does not shield the Government from liability for Plaintiffs' claims.**

Next, the Government argues that Plaintiffs' claims fall under the Due Care Exception ("DCE"), which applies if (1) "a statute or regulation in question specifically pr[e]scribes a course of action for an officer to follow," and (2) "the officer exercised due care in following the dictates of that statute or regulation." *Welch v. United States,* 409

1    F.3d 646, 652 (4th Cir. 2005).[6] The Government, however, has failed to satisfy either

2    prong of the DCE—indeed it does not even attempt to address the second prong.

3                    1.      **The Government was not executing a statue or regulation when**
                            **it separated F.R. and A.A.**

4            The first prong of the DCE requires a statute or regulation specifically prescribe a

5    course of action for an officer to follow.  Yet, as the Government implicitly concedes

6    there was no statute or regulation requiring the Government to separate Plaintiffs. Indeed,

7    the Government has admitted it has stopped separating children from their families in the

8    circumstances alleged in the Complaint (*see* Mot. at 2) such that practice *could not* have

9    been mandated by a statute or regulation. *See Nunez Euceda*, 2021 WL 4895748, at *3–4;

10   *A.P.F.*, 492 F. Supp. 3d at 995–96; *C.M. I*, 2020 WL 1698191, at *3.

11           Instead, the Government tries to alter the DCE standard by arguing that the DCE

12   applies not only when a course of conduct is required by a statute or regulation, but also

13   when the conduct is simply "authorized by statute or regulation." Mot. at 21. But that is

14   simply not the relevant test. Courts in this Circuit ask whether a statute or regulation

15   *requires* Government officials to perform conduct when assessing a DCE defense. *E.g.,*

16   *Nunez Euceda*, 2021 WL 4895748, at *4 (stating, en route to denying motion to dismiss

17   FTCA/family-separation claim, that "[t]he [DCE] applies if a statute or regulation

18   'specifically pr[e]scribes a course of action. . . .'"); *C.M. II*, 2020 WL 5232560, at *4

19   (assessing prevalence of *Welch*'s test and declining to certify denial of motion to dismiss

20   for appeal); *A.P.F.*, 492 F. Supp. 3d at 995-96.

21           To justify departing from this settled law, the Government primarily relies on

22   *Borquez v. United States*, 773 F.2d 1050, 1053 (9th Cir. 1985).[7] But, as *C.M. I* explains,

23

24           [6] District courts throughout this Circuit apply the Welch test. *C.M. v. United*
     *States*, No. CV-19-05217-PHX-SRB, 2020 WL 5232560, at *4 (D. Ariz. July 6, 2020)
25   ("*C.M. II*") (denying motion for interlocutory appeal after Government failed to show a
     Circuit dispute regarding the test for deciding whether the DCE applies).
26
             [7] The Government also cites to two other out-of-Circuit cases to support its
27   position. Mot. at 21. Neither provides helpful guidance. *FDIC v. Citizens Bank & Trust*
     *Co. of Park Ridge, Ill.* did not address the DCE and instead considered "whether the
28   [FTCA] . . . withdrew the sue-and-be-sued liability of FDIC under 12 U.S.C. s 1819 for

2020 WL 1698191, at *3, *Borquez* did not hold that the DCE encompasses any governmental conduct that was "authorized" by a statute or regulation. Instead, and at most, it creates a narrow exception to *Welch* and held that the DCE applies when a single statutory or regulatory provision expressly authorizes the exact tortious conduct challenged by a FTCA claim. In other words, *Borquez*'s holding only comes into play if adjudicating a FTCA claim would require the court to rule on the legality of a statutory or regulatory provision.

Plaintiffs' claims would not require the Court to rule on the legality of a statute or regulation; thus *Borquez* does not apply. There is no single statutory or regulatory provision that expressly authorized the Government to separate Plaintiffs in the circumstances alleged in the Complaint. And the Government doesn't identify any. After reciting the DCE standard, the Government uses a single sentence to identify the statute purportedly at issue: 8 U.S.C. § 1232(b)(3), which requires, subject to exceptions, that the Government transfer unaccompanied immigrant children from DHS to ORR custody within "72 hours [of] determining that such child is an unaccompanied alien child." That provision does not address—let alone authorize—the forcible, prolonged family separation described and challenged in the Complaint.

### 2. The Government did not exercise due care when separating F.R. and A.A.

The Government omits the second *Welch* prong from its brief, incorrectly asserting that "where a government employee's actions are authorized by statute or regulation . . . the claim must be dismissed for lack of subject matter jurisdiction." Mot. at 21. But, for the DCE to apply, the Government must not only show that officials were executing a statute or regulation, but also that those official actually "exercis[ed] due care" when doing so. 28 U.S.C. § 2680(a). "Due care," in turn, "implies at least some

---

torts not covered by that Act." 592 F.2d 364, 365 (7th Cir. 1979). *Sickman v. United States* addressed the DCE but does not opine on the appropriate test for determining when it applies. 184 F.2d 616, 619 (7th Cir. 1950).

minimal concern for the rights of others." *Hatahley v. United States*, 351 U.S. 173, 181 (1956).

The Government has not even attempted to argue that its forcible and prolonged separation of the Plaintiffs was done with due care. Given that it is the Government's burden to prove that the DCE applies, that failure is, on its own, reason enough to reject application of the DCE to Plaintiffs' claims. *See Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992). And Plaintiffs allege ample facts showing that the Government failed to take due care. Officials did not, for example, implement systems to track families after they were separated so they could be reunited, despite warnings that such systems were necessary and did not yet exist. Compl. ¶ 56; *see also Ms. L. I*, 310 F. Supp. 3d at 1144 (observing that the "unfortunate reality is that . . . migrant children [we]re not accounted for with the same efficiency and accuracy as property"). They left Plaintiffs in the dark about why they were being separated and for how long. Compl. ¶¶ 37–39, 40, 44, 46. They kept F.R. and A.A. separated for weeks without providing any updates or any means of communication. *Id.* ¶¶ 38, 40, 44. They refused to answer basic questions about where separated family members were located and how those family members were faring. *Id.* A.A. was locked in a room by himself, apart from the other children, on multiple occasions as punishment. *Id.* ¶ 42.  A.A. was separated from F.R. for approximately 100 days, before reuniting in Honduras. Compl. ¶ 48. After more than a month in detention, the U.S. government deported F.R. to Honduras without A.A. Compl. ¶ 44.  As these allegations show, Government officials did not exhibit even a "minimal concern" for Plaintiffs when separating them. *Hatahley*, 351 U.S. at 181. The DCE therefore does not apply.

### D.  Plaintiffs' claims satisfy the FTCA's private analogue requirement.

The Government's next argument for dismissal is that Plaintiffs' claims do not satisfy the FTCA's private analogue requirement. Under this requirement, sovereign immunity is waived in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or

1    omission occurred." 28 U.S.C. § 1346(b)(1). In other words, plaintiffs need only show

2    that "a private individual under like circumstances would be liable under state law."

3    *United States v. Muniz*, 374 U.S. 150, 153 (1963). "Recognizing that the federal

4    government could never be exactly like a private actor, the Ninth Circuit only requires

5    courts to find the most reasonable analogy to private tortious conduct." *A.P.F.*, 492 F.

6    Supp. 3d at 994 (internal quotation marks omitted).

7         The analysis here is straightforward and demonstrates the Plaintiffs' claims satisfy

8    the private analogue requirement. F.R. and A.A. allege that Government officials forcibly

9    separated them for approximately 100 days without reasonable justification. Thus, to

10   satisfy the private analogue requirement, Plaintiffs need only show that a private

11   individual would be liable under state law for improperly separating a parent from a

12   child. Indeed, improper family separation by a private individual is a violation of Arizona

13   law, especially where a defendant is responsible for the care and custody of the parent

14   and child, as the Government was here.[8] Unsurprisingly, then, courts (including Arizona

15   courts) have uniformly recognized that there is a private analogue under Arizona law for

16   FTCA claims arising from the Government's separation of families at the border. *See*

17   *A.P.F.*, 492 F. Supp. 3d at 994–95; *C.M.I*, 2020 WL 1698191, at *2; *cf. Nunez Euceda*,

18   2021 WL 4895748, at *4 (family separation FTCA claims satisfied private analogue

19   requirement).

20        The Government does not seriously dispute that a private individual would be liable

21   under Arizona law for improperly separating parent from child.  Instead, the Government

22

23        [8] *Pankratz v. Willis*, 744 P. 2d 1182, 1189 (Ariz. Ct. App. 1987) (finding that "the
     unilateral separation of a child from its parent can" qualify as intentional infliction of
24   emotion distress ("IIED")); *Martinez v. United States*, No. CV-13-00955-TUC-CKJ
     (LAB), 2018 WL 3359562, at *10–12 (D. Ariz. July 10, 2018) (threatening to separate
25   family can qualify as IIED under Arizona law); *Dobek v. Wal-Mart Stores, Inc.*, No. CV
     03-297-TUC-FRZ, 2007 WL 2069832, at *4 (D. Ariz. July 17, 2007) (recognizing loss of
26   consortium claims for parents and children); *Est. of Smith v. Shartle*, No. CV-18-00323-
     TUC-RCC, 2020 WL 1158552, at *2 (D. Ariz. Mar. 10, 2020) ("Like a nursing facility
27   employee, a [prison] employee is tasked with the care of persons who are dependent upon
     them to make daily housing and safety determinations.").
28
                                        - 21 -

argues that "[b]ecause only the federal government has the authority to enforce federal criminal and immigration laws and make detention determinations, there is no private-person analogue." Mot. at 23.

However, as previously discussed, this is not the Plaintiffs' claim. Plaintiffs are not broadly challenging the Government's enforcement of laws or its detention determination. The tortious conduct underlying Plaintiffs' claims is the prolonged and forcible separation of Plaintiffs from each other as a family.[9]

Additionally, the Government's argument misstates the law. The fact that the Government's conduct occurred in a uniquely governmental context, like immigration or criminal detention, does not mean there is no private analogue for the conduct. "Even for alleged torts occurring in quintessentially federal contexts, the question remains whether analogous private liability exists under state law." *Liranzo v. United States*, 690 F.3d 78, 97 (2d Cir. 2012). Stated differently, "[a]nalogy not identity of circumstances is key." *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010). The conduct itself, not the context where the conduct occurred, is what determines whether there is a private analogue. Thus, the Government's arguments to the contrary are without merit.

**E.    The Government's "systemic" tort prohibition lacks legal support and does not bar Plaintiffs' claims**

The Government's final attempt to convince the Court to dismiss Plaintiffs' claims involves inventing a new rule. The Government asserts that "a plaintiff cannot assert 'systemic' claims" against "the United States directly." Mot. at 24. Instead, they must "allege tortious conduct by individual federal employees, acting within the scope of their employment." *Id.*

---

[9] The cases the Government cites are inapposite. *Elgamal v. United States* held that there was no private analogue in Arizona for a negligence challenge to the adjudication of an application for adjustment of status to lawful permanent residence, a factual context that is wholly unrelated to Plaintiffs' claims of forcible and prolonged family separation. *See* No. CV-13-00867-PHX-DLR, 272015 WL 13648070, at *3 (D. Ariz. July 8, 2015). And *Bhuiyan v. United States* does not involve Arizona law at all. *See* No. 14-cv-00013, 2017 WL 2837023, *4 (D.N. Mar. Is. June 30, 2017), cert. denied, 140 S.Ct. 1147 (2020) (applying the law of Vermont and the Northern Marianas Islands).

1    At the outset, it is unclear what the Government means when it refers to

2 "systemic" claims or where the supposed prohibition against such claims springs from. It

3 cites *Adams v. United States*, 420 F.3d 1049 (9th Cir. 2005), and *Lee v. United States*, CV

4 19-08051-PCT-DLR (DMF), 2020 WL 6573258 (D. Ariz. Sept. 18, 2020), but neither

5 case discusses "systemic" claims. *Adams* merely holds that under the FTCA a corporation

6 cannot be an "employee" of the Government, which is not a question at issue here. This

7 court in *Lee* explicitly notes that *Adams* is "not directly on point" because "[p]laintiff has

8 not attempted to sue the Government under the FTCA for the alleged negligent acts of a

9 private corporation or any other 'corporate entity.'" 2020 WL 6573258, at *7. *Lee*

10 dismissed the claim because plaintiff's allegations were "too vague and conclusory" and,

11 among other things, had not "set forth the alleged acts or omissions of specific federal

12 employees." *Id.* at *5.

13    The issues in *Adams* and *Lee* are not present here. Contrary to the Government's

14 contention that Plaintiffs' Complaint "attribute[s] the alleged tortious conduct to the

15 government as a whole," Mot. at 24, Plaintiffs identify and describe individual federal

16 employees, "working within the scope of their employment." Compl. ¶ 13; *see also id.* ¶¶

17 35, 37-38, 40, 42 (describing the actions of immigration officials). In fact, the

18 Government itself acknowledges that "Plaintiffs have alleged actions of various kinds by

19 various officials," Mot. at 20, who engaged in tortious conduct by, for example,

20 designing the Government's practice of separating families at the border with knowledge

21 and intent to cause harm, *see* Compl. ¶¶ 20–24, 30-32; physically and forcibly separating

22 F.R. and A.A., *id.* ¶ 37; and unlawfully withholding information about A.A. from F.R.

23 and depriving F.R. and A.A. of contact. *Id.* ¶¶ 38, 40, 41. *See also Nurse*, 226 F.3d at

24 1001 (reversing dismissal of FTCA claims alleging that policy-makers "established

25 policies that would result in false arrests and unlawful detentions").

26    To the extent the Government protests the Complaint's references to "the United

27 States government," "the U.S. government," and "the government," Mot. at 24, no legal

28 authority supports the proposition that a complaint containing FTCA claims should be

dismissed because some allegations make such references. Instead, the Government's proposed rule would make no sense given that "the FTCA imposes liability on the United States government[.]" *Ting v. United States*, 927 F.2d 1504, 1513 (9th Cir. 1991). This argument lacks a basis in law and the Court should reject it.

## IV.      CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Government's Motion to Dismiss.

RESPECTFULLY SUBMITTED this 7th day of March, 2022.

RUKIN HYLAND & RIGGIN LLP

By:    /s/ Valerie Brender

Peter Rukin
Jessica Riggin
Valerie Brender

MITCHELL | STEIN | CAREY | CHAPMAN, PC

Kathleen E. Brody
Molly Brizgys

Attorneys for Plaintiffs